# IN THE SUPREME COURT, STATE OF WYOMING

# 2020 WY 153

OCTOBER TERM, A.D. 2020

*December 18, 2020*

CHARLES ALFRED ARMAJO,

Appellant
(Defendant),

v.

S-20-0088

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Laramie County*
*The Honorable Catherine R. Rogers, Judge*

*Representing Appellant:*

    Diane M. Lozano, State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; H. Michael Bennett, Senior Assistant Appellate Counsel; Corthell and King, P.C., Laramie, Wyoming. Argument by Mr. Bennett.

*Representing Appellee:*

    Bridget L. Hill, Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames, Senior Assistant Attorney General. Argument by Mr. Eames.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BOOMGAARDEN, Justice.**

[¶1]    After a jury trial, Charles Alfred Armajo was convicted of second degree sexual abuse of a minor under Wyo. Stat. Ann. § 6-2-315(a)(iv).  On appeal, he challenges the district court's denial of his motion for judgment of acquittal and the sufficiency of the evidence.  He also argues the prosecutor engaged in prejudicial misconduct in rebuttal argument.  We affirm.

## *ISSUES*

[¶2]    We restate the issues:

> I. Did the district court err in denying Mr. Armajo's motion for judgment of acquittal?
>
> II. Was the evidence sufficient to convict Mr. Armajo?
>
> III. Did prosecutorial misconduct deny Mr. Armajo a fair trial?

## *FACTS*

[¶3]    In September 2017, when ZL was 14 years old, she and her mother traveled from China to Minnesota to visit prospective schools for ZL.  ZL's mother met Mr. Armajo on that trip and they began a romantic relationship.  In January 2018, ZL and her mother moved to Minnesota.  Over the following months, ZL's mother married Mr. Armajo and they moved to Cheyenne, Wyoming after he found a job and she bought a home there.  In June, ZL moved to Cheyenne to live with them and attend a local high school.

[¶4]    On October 16, 2018, while alone in the home, Mr. Armajo engaged in a Native American "ceremony" with ZL to commemorate her first hunting trip three days prior.  At school the next day, ZL told the school counselor that Mr. Armajo inappropriately touched her during the ceremony.  The counselor reported the allegation to law enforcement.

[¶5]    Later that month, following an investigation, the State charged Mr. Armajo with one count of second degree sexual abuse of a minor under Wyo. Stat. Ann. § 6-2-315(a)(iv).  The information alleged that on October 16, 2018, Mr. Armajo "did, being thirty-four (34) years of age, engage in sexual contact with [ZL] (YOB 2003) who is fifteen (15) years of age, and [Mr. Armajo] is the step-father to [ZL][.]"

1

[¶6]     The case proceeded to trial the following September, where the State's case hinged primarily on ZL's testimony.[1] ZL and her mother testified through an interpreter because English is their second language.  In opening statements, the prosecutor informed the jury that the theme of the case was simple: "[s]exual assault is a universal language."  ZL would testify about what her stepfather did to her.  Despite language and cultural differences, ZL knew that what he did to her during the "ceremony" was wrong, so she reported it to her mother, her school counselor, and law enforcement.  Defense counsel countered that Mr. Armajo, who is Native American and devout in his religious practices and spirituality, performed a ceremony that ZL misunderstood due to language and cultural barriers.

[¶7]     ZL testified on direct examination about several events that occurred from June to October 2018.  In June, Mr. Armajo pulled her aside in their home to show her some tools he used to perform Native American rituals.  When ZL asked Mr. Armajo why he did not teach his brother about the tools, he responded that "his brother [did] not have the gift" but she did.  Mr. Armajo told her to lay down on the couch and she obliged.  Then he lifted her shirt so he could "show [her] a few pressure points o[n] [her] body[.]"  When he "tried to take off [her] pants," ZL got up and told him he could not "do that."  The next day, ZL told her mother what had happened.  Her mother told Mr. Armajo not to touch ZL or perform any rituals with ZL.

[¶8]     On October 13, when ZL was 15 years old, Mr. Armajo took ZL and her mother hunting near Riverton, Wyoming.  Mr. Armajo helped ZL shoot her first deer.  ZL's mother stayed in the car while Mr. Armajo and ZL collected the deer.  On their way to collect the deer, Mr. Armajo told ZL that he wanted to tell her something but she "could not tell [her] mother."  If she did, then her mother would divorce him, and ZL and her mother "would not be able to get [their] Green Card[s]."  Mr. Armajo proceeded to tell ZL about a dream he had in which, after graduating from high school, ZL gave birth to his child at the hospital.  ZL "rapidly took care of the deer and ran back to the car."  She did not tell her mother about the dream.

[¶9]     Three days after the hunting trip, Mr. Armajo picked ZL up from school and brought her back home after running some errands.  ZL's mother was not home.  "Typically [Mr. Armajo] never allowed [ZL's] mother to go, but that day he allowed [ZL's mother] to go visit her Chinese friend."  Mr. Armajo told ZL that they needed to "prepare" the deer.  But, because it had been her first hunting trip, he wanted to perform a ritual with her.  ZL was uncomfortable participating in any ritual but agreed because she thought he had received permission from her mother.  They went into the living room and Mr. Armajo told ZL to lie on the couch or the floor so he could breathe smoke into her mouth.  ZL chose to lie on the floor.  Mr. Armajo blew smoke into ZL's mouth, but she told him to stop, which he did.

---

[1] The pretrial proceedings are not relevant to this appeal.

[¶10]   Next, Mr. Armajo kneeled over ZL, who was clothed and laying on her back, and pulled her closer to him.  ZL "felt that [her] butt was very close to him."  Mr. Armajo started lifting ZL's legs into the air so that ZL's bottom was "[h]alf . . . on the floor," and the other "half [was] kind of up[.]"  Mr. Armajo then lifted ZL's shirt and gave her a massage.  ZL made him stop because he was not supposed to touch her skin.

[¶11]   Mr. Armajo had ZL turn on to her side.  He lifted one of ZL's legs into the air, and straddled her leg that was still on the floor.  He began massaging her legs, gradually moving up her thigh.  At this point, ZL "noticed [Mr. Armajo's] reproductive organ was different."  ZL felt it moving on her buttocks.  ZL, who was now scared, told Mr. Armajo she was done and left the room.

[¶12]   Later that night, after her mother returned home, ZL told Mr. Armajo, in front of her mother, "don't you ever play any ritual on me."  His face turned red and he agreed.  ZL told her mother that Mr. Armajo "had some skin contact" with her.  This upset ZL's mother because she had previously warned him not to engage in any rituals with ZL.  When ZL's mother tried to call the police, Mr. Armajo "took her phone away and put the phone in his pocket."  He told her not to call the police because if she did they would all be in trouble.  ZL's mother tried to take the phone back but ZL told her to stop.  At school the next day, ZL told her teacher and then the school counselor what happened the night before.  The school counselor reported the allegation to law enforcement.  Officers came to the school that afternoon and had ZL provide a written statement.

[¶13]   The State called ZL's mother to address what she recalled about October 16.  She testified that Mr. Armajo drove her to her friend's shop around 9:30 a.m. that morning, where she remained until he picked her up around 6:00 p.m.  On arriving home, ZL told her that Mr. Armajo had given her a massage.  ZL's mother became very upset at Mr. Armajo but did not report the incident to the police because he took her phone away and put it in his pocket.  She tried to get the phone back but ZL asked her to stop.

[¶14]   The State's remaining evidence addressed ZL's disclosure and the investigation.  The school counselor testified that ZL "seem[ed] very upset and worried" when he spoke to her.  Two officers broadly discussed gathering information related to the allegation at the school, speaking to ZL's mother, and obtaining a search warrant for Mr. Armajo's phone.

[¶15]   The defense did not call any witnesses, but did introduce several exhibits during ZL's cross-examination.  It introduced a short video that Mr. Armajo took on his phone during the hunting trip.  The video did not capture any dream discussion.  The defense also introduced photographs of Mr. Armajo and ZL together on the hunting trip, the home's living room area, and ZL cutting deer meat in the kitchen after the ceremony.

3

[¶16]   Mr. Armajo moved for judgment of acquittal under W.R.Cr.P. 29, arguing that his incidental touching of ZL during the ceremony did not satisfy the "sexual contact" element of second degree sexual abuse of a minor.  The court denied his motion based on ZL's testimony "that her body came in contact with the clothing covering the immediate area of Mr. Armajo's erect penis."[2]

[¶17]   In closing argument, the prosecutor walked the jury through the elements and supporting evidence.  Defense counsel maintained that there was no evidence that sexual contact occurred.  He also argued that what occurred was part of a ceremony that ZL misunderstood, challenged ZL's credibility, and questioned whether ZL had a motive to fabricate the allegation.  The prosecutor's rebuttal drew three sustained objections in close succession:

> [Prosecutor]: What you heard from ZL was not an allegation. It was evidence.  And your jury instructions tell you it was direct evidence.
>
> Using your life experience, why does an adult man's penis move up and down to such a degree that a 15-year-old girl can feel through her clothing and his?  Sexual arousal, sexual gratification and that is sexual contact.
>
> ZL didn't testify that the sexual assault made her uncomfortable.  She testified that it scared her.  Child sex abuse perpetrators are [the] ones who choose.  They choose where it happens.
>
> [Defense counsel]: Objection, Your Honor.  These facts are not in evidence.  It's pulling at the heart strings of the jury in regards to sexual abuse victims in general.
>
> [Court]: Sustained.
>
> [Prosecutor]: In this particular case, Mr. Armajo chose a house with no mom present and no one else there to see.  He chose a 15-year-old who was trying her best to obey the adult in her life and be respectful, but who struggles to understand even the language, much less what was happening to her.

---

[2] The district court acknowledged that ZL did not use those precise words.

4

The defense would ask that you believe this was a ceremony from a native people's cultural heritage. ZL told you that there was nothing that happened, when she was on the floor, that was similar to any other ceremony she had seen because this wasn't a ceremony and to call it such is despicable. This was a sexual assault.

[Defense counsel]: Objection, Your Honor. Denigrates defense counsel.

[Court]: Sustained.

[Prosecutor]: It's no different than when a priest in the Catholic Church administers confession but [it] is actually sexual assault.

[Defense counsel]: Objection, Your Honor. Are we actually connecting these set of circumstances to the something in the Catholic Church and priests or otherwise? That is impassioning the prejudice -- impassions the jury as well. I ask counsel here to stick to the evidence in this case.

[Court]: Sustained.

[Prosecutor]: Mr. Armajo's genitalia, what ZL described as his reproductive organ, was moving up and down on her when she was on the floor with one leg in the air and he was in between her legs, that is the evidence and that is sexual assault. Mr. Armajo is guilty. The State asks that you find him such.

[¶18] After deliberations, the jury found Mr. Armajo guilty. The district court entered judgment on the verdict and sentenced him to 10 to 12 years.

## DISCUSSION

### I. Motion for judgment of acquittal and sufficiency of the evidence

[¶19] Mr. Armajo separately challenges the district court's denial of his motion for judgment of acquittal and the sufficiency of the evidence. He acknowledges that his arguments are "really no different," but asserts the applicable standards of review are "slightly different." In each, he contends the State produced insufficient evidence that a "touching" occurred, and no evidence of his intent.

5

## A. Standard of Review

[¶20]  We need only review for sufficiency of the evidence because, "[a]s a practical matter, the standard of review for denial of a motion for judgment of acquittal is the same as that used when an appeal claims insufficient evidence to convict." *Foltz v. State*, 2017 WY 155, ¶ 10, 407 P.3d 398, 401 (Wyo. 2017).  "This is because these appeals both challenge the sufficiency of the evidence." *Id.*; *see also Thompson v. State*, 2018 WY 3, ¶ 13 n.1, 408 P.3d 756, 760 n.1 (Wyo. 2018) (citation omitted) ("Although we often say that we defer to the district court's decision denying a motion for judgment of acquittal, we actually review the sufficiency of the evidence.").

[¶21]  In reviewing for sufficiency of the evidence, we must "decide whether the evidence could reasonably support the jury's verdict." *Huckins v. State*, 2020 WY 21, ¶ 10, 457 P.3d 1277, 1279 (Wyo. 2020) (citing *Thompson*, ¶ 14, 408 P.3d at 760; *Mraz v. State*, 2016 WY 85, ¶ 19, 378 P.3d 280, 286 (Wyo. 2016)).  "We do not reweigh the evidence or reexamine the credibility of the witnesses." *Id.* (citation omitted).  "Instead, we examine 'the evidence in the light most favorable to the State.  We accept all evidence favorable to the State as true and give the State's evidence every favorable inference which can reasonably and fairly be drawn from it.'" *Id.* (citation omitted).  "We 'disregard any evidence favorable to the appellant that conflicts with the State's evidence.'" *Id.* (citation omitted).

## B. Sufficiency of the Evidence

[¶22]  The jury found Mr. Armajo guilty of second degree sexual abuse of a minor under Wyo. Stat. Ann. § 6-2-315(a)(iv) (LexisNexis 2019), which states:

> (a) Except under circumstance constituting sexual abuse of a minor in the first degree as defined by W.S. 6-2-314, an actor commits the crime of sexual abuse of a minor in the second degree if:
>
> . . . .
>
> (iv) Being eighteen (18) years of age or older, the actor engages in sexual contact with a victim who is less than sixteen (16) years of age and the actor occupies a position of authority in relation to the victim.

"Sexual contact" is statutorily defined as "touching, with the intention of sexual arousal, gratification or abuse, of the victim's intimate parts by the actor, or of the actor's intimate parts by the victim, or of the clothing covering the immediate area of the victim's or actor's

intimate parts[.]" Wyo. Stat. Ann. § 6-2-301(a)(vi) (LexisNexis 2019). "Intimate parts" means "the external genitalia, perineum, anus or pubes of any person or the breast of a female person[.]" Wyo. Stat. Ann. § 6-2-301(a)(ii) (LexisNexis 2019).

### 1. Evidence of Touching

[¶23]  The crux of Mr. Armajo's argument that the State produced insufficient evidence of "touching" under the statutory definition of sexual contact "is that sexual contact requires more than an incidental touch or brushing against the intimate parts of the actor."  He maintains that "[i]t requires an affirmative act by the victim to touch the intimate parts of the actor," which "could be accomplished by a number of means, but a tap, or incidental brushing against the intimate parts of the actor is not enough."  He further asserts that the definition requires "an affirmative act, whether the victim touches the actor on his or her own or whether forced by the actor."  Turning to the evidence presented, he argues that it would have been nearly impossible for him to hold ZL's legs in the manner she described without his body coming into contact with her and that "[t]he 'tap' or incidental brushing against [ZL] of [his] 'reproductive organ,' while probably unsettling for [ZL], was not sexual contact[.]"

[¶24]  Mr. Armajo did not touch ZL's intimate parts or the clothing covering the immediate area of her intimate parts.  Moreover, ZL did not touch his intimate parts, as they were both clothed.  Thus, the relevant portion of the sexual contact definition is "touching, with the intention of sexual arousal, gratification or abuse, . . . of the clothing covering the immediate area of the . . . actor's intimate parts" by the victim.  Wyo. Stat. Ann. § 6-2-301(a)(vi).

[¶25]  As a preliminary matter, contrary to Mr. Armajo's suggestion, the sexual contact definition contains no requirement that the defendant force the victim to touch him.  Nor does the definition specify that the victim must have touched the defendant on the victim's own initiative.  And the definition provides no exception for "incidental" or "unavoidable" contact.  The statute does, however, protect against criminal liability for "incidental" and "unavoidable" contact through the intent requirement, which we address in more detail below.

[¶26]  We further disagree with Mr. Armajo's characterization of the evidence.  Viewed in the light most favorable to the State, the evidence reflects that Mr. Armajo initiated the "ceremony" and then repeatedly manipulated and directed the movement of ZL's body.  Mr. Armajo eventually started massaging ZL's lower legs and then gradually moved up her thigh.  At the time, "his pants [were] very close to [ZL's] butt" because that is how he had positioned himself, and she felt his reproductive organ moving up and down for a short period before she pushed him away.  The jury could reasonably conclude that this orchestrated contact was more than "incidental" or "unavoidable."

7

[¶27] Most importantly, whether Mr. Armajo caused or allowed the touching to occur, the jury could reasonably conclude from ZL's testimony that the State established beyond a reasonable doubt there was a "touching . . . of the clothing covering the immediate area of . . . [Mr. Armajo's] intimate parts" by ZL. Wyo. Stat. Ann. § 6-2-301(a)(vi). Mr. Armajo's "reproductive organ" undisputedly falls within the definition of "intimate parts" because it constitutes his "external genitalia." Wyo. Stat. Ann. § 6-2-301(a)(ii)

### 2. Evidence of Intent

[¶28] Under Wyo. Stat. Ann. § 6-2-315(a)(iv), it was not enough for the State to establish that Mr. Armajo caused or allowed ZL to touch the clothing immediately covering his intimate parts. The State also had to establish that he did so with the "intent of sexual arousal, gratification, or abuse." *Trumbull v. State*, 2009 WY 103, ¶ 13, 214 P.3d 978, 981 (Wyo. 2009); Wyo. Stat. Ann. § 6-2-301(a)(vi). "Because direct evidence of intent is rare, and circumstantial evidence is most often the only proof available, we have held that intent may be proven by circumstantial evidence alone." *Jones v. State*, 2017 WY 44, ¶ 34, 393 P.3d 1257, 1265 (Wyo. 2017) (citing *Montee v. State*, 2013 WY 74, ¶ 21, 303 P.3d 362, 366 (Wyo. 2013)). In that regard, we look to Mr. Armajo's "conduct and [the] circumstances of physical contact." *Trumbull*, ¶ 13, 214 P.3d at 981 (emphasis omitted) (citing 2 Paul DerOhannesian II, *Sexual Assault Trials*, § 16.19, 326 (3rd ed. 2006)).

[¶29] Our precedent is instructive on the types of conduct and circumstances sufficient to establish the defendant's intent. In *Trumbull*, we said that "[i]ntent of sexual gratification may be inferred from touching the complainant on more than one occasion, and committing the act after no adults were remaining in the house." *Id.* (citation omitted). In *Jones*, the defendant's "effort to mask his actions by placing a blanket over himself and the girls, his repeated touchings of the girls in virtually identical ways, and his instructions to keep the touchings secret provided sufficient circumstantial evidence" of intent. *Jones v. State*, 2019 WY 45, ¶ 30, 439 P.3d 753, 763 (Wyo. 2019). In *Martinez*, evidence that the defendant engaged in the touching while alone with the victim in the bathroom and that she told the victim to keep the touching a secret contributed to our conclusion that the evidence was sufficient to establish intent. *Martinez v. State*, 2018 WY 147, ¶ 27, 432 P.3d 493, 500 (Wyo. 2018).

[¶30] The State's evidence of Mr. Armajo's conduct and the circumstances before, during, and after the incident reflected that Mr. Armajo had previously touched ZL while telling her how to perform a ritual and been warned not to touch ZL or "perform any ritual" with her. During the hunting trip three days before the charged incident, Mr. Armajo told ZL, a 15-year-old, that he had a dream about her having his child and he warned her not to tell her mother. Mr. Armajo engaged in the "ceremony" when he knew ZL's mother would not be home. When ZL's mother tried to call the police after ZL told her part of what had happened, Mr. Armajo took the phone away from her. Taken together, this evidence

permitted a reasonable jury to conclude that Mr. Armajo caused or allowed the touching to occur for the purpose of sexual gratification. *See Jones*, ¶ 30, 439 P.3d at 762–63; *Martinez*, ¶¶ 26–27, 432 P.3d at 499–500; *Trumbull*, ¶ 13, 214 P.3d at 981.

## II.    *Prosecutorial misconduct in rebuttal argument*

[¶31]  Mr. Armajo contends the prosecutor engaged in misconduct when she stated in rebuttal argument: (1) "Child sex abuse perpetrators are [the] ones who choose.  They choose where it happens."; (2) "[T]his wasn't a ceremony and to call it such is despicable."; and (3) "It's no different than when a priest in the Catholic Church administers confession but [it] is actually sexual assault."

### A. Standard of Review

[¶32]  "Prosecutorial misconduct occurs when a prosecutor illegally or improperly attempts to persuade a jury 'to wrongly convict a defendant or assess an unjustified punishment.'" *Hartley v. State*, 2020 WY 40, ¶ 9, 460 P.3d 716, 719 (Wyo. 2020) (quoting *Bogard v. State*, 2019 WY 96, ¶ 16, 449 P.3d 315, 320 (Wyo. 2019)).  Mr. Armajo "bears the burden of establishing prosecutorial misconduct."  *Bogard*, ¶ 16, 449 P.3d at 321 (quoting *Dixon v. State*, 2019 WY 37, ¶ 41, 438 P.3d 216, 231 (Wyo. 2019)).

[¶33]  Because Mr. Armajo objected to each statement, we review for harmless error after first determining if error occurred.  *Bogard*, ¶ 18, 449 P.3d at 321 (citing *Black v. State*, 2017 WY 135, ¶ 13, 405 P.3d 1045, 1050 (Wyo. 2017); *King v. State*, 2018 WY 52, ¶ 11, 417 P.3d 657, 660 (Wyo. 2018)); *see also Gonzalez–Ochoa v. State*, 2014 WY 14, ¶ 15, 317 P.3d 599, 604 (Wyo. 2014). "To demonstrate harmful error, the defendant must show prejudice under circumstances which manifest inherent unfairness and injustice or conduct which offends the public sense of fair play." *Dixon*, ¶ 40, 438 P.3d at 231 (quoting *Dysthe v. State*, 2003 WY 20, ¶ 10, 63 P.3d 875, 881 (Wyo. 2003)).

[¶34]  "In *McGinn*, we discussed five factors this Court balances to determine whether prosecutorial misconduct was harmless."

> 1) the severity and pervasiveness of the misconduct; 2) the significance of the misconduct to the central issues in the case; 3) the strength of the State's evidence; 4) the use of cautionary instructions or other curative measures; and 5) the extent to which the defense invited the misconduct.

*Sam v. State*, 2017 WY 98, ¶ 66, 401 P.3d 834, 856 (Wyo. 2017) (quoting *McGinn v. State*, 2015 WY 140, ¶ 16, 361 P.3d 295, 299–300 (Wyo. 2015)).

## B. Misconduct Analysis

[¶35] Because the alleged misconduct occurred during the prosecutor's rebuttal argument, we bear in mind that "[a]ttorneys are afforded wide latitude during closing argument and may comment on evidence admitted during trial and suggest reasonable inferences." *Hartley*, ¶ 13, 460 P.3d at 720 (citing *Bogard*, ¶ 19, 449 P.3d at 321). "We evaluate the 'propriety of closing arguments in the context of the entire argument and compare them with the evidence produced at trial.'" *Id.* ¶ 16, 460 P.3d at 720 (quoting *Dixon*, ¶ 41, 438 P.3d at 231). "At its core, prosecutorial misconduct in closing argument is a tactic meant to encourage a conviction on an improper basis." *Larkins v. State*, 2018 WY 122, ¶ 96, 429 P.3d 28, 50 (Wyo. 2018) (citation omitted). "It is argument without reference to the evidence or those reasonable inferences that can be drawn from that evidence and threatens a defendant's right to a fair trial." *Id.*

### 1. Personal Attack Against Defense Counsel

[¶36] "It is prosecutorial misconduct to 'launch personal attacks against defense counsel to inflame the passions and prejudices of the jury.'" *Bogard*, ¶ 38, 449 P.3d at 324 (quoting *Hamilton v. State*, 2017 WY 72, ¶ 14, 396 P.3d 1009, 1014 (Wyo. 2017)). In *Black*, the prosecutor asserted that aspects of defense counsel's argument were "offensive" and we concluded this amounted to an improper, personal attack on defense counsel. *Black*, ¶ 35, 405 P.3d at 1057. In *Hamilton*, however, we concluded that the prosecutor's characterization of defense counsel's arguments as "ridiculous," "absurd," and "bizarre," though ill-advised, did not amount to prosecutorial misconduct because the remarks were related to the prosecution's view of the defense's case. *Hamilton*, ¶¶ 13–14, 396 P.3d at 1013–14.

[¶37] Mr. Armajo contends the prosecutor denigrated defense counsel when she stated that "this wasn't a ceremony and to call it such is despicable." The State admits the prosecutor's statement was improper. We agree. There is little meaningful distinction between the prosecutor here calling defense counsel's argument "despicable" and the prosecutor in *Black* calling defense counsel's argument "offensive." *See Black*, ¶ 35, 405 P.3d at 1057. The statement was not related to the prosecution's view of the defense's case. *Cf. Hamilton*, ¶ 14, 396 P.3d at 1014. It amounted to an improper, personal attack on defense counsel.

### 2. Inflaming the Jury's Passions or Prejudices

[¶38] "[I]t is well-settled that 'arguments calculated to inflame the passion or prejudice of the jury violate ABA Standards for Criminal Justice regarding argument to the jury.'" *Bogard*, ¶ 67, 449 P.3d at 331 (quoting *Black*, ¶ 33, 405 P.3d at 1056); *see also Solis v. State*, 2013 WY 152, ¶ 50, 315 P.3d 622, 633 (Wyo. 2013) ("Remarks and evidence that

10

tend to inflame the passions or prejudices of a jury cross the line separating fact from emotion[.]"). "The word 'inflammatory' means '[t]ending to cause strong feelings of anger, indignation, or other type of upset; tending to stir the passions.'" *Bogard*, ¶ 67, 449 P.3d at 331 (quoting *Black's Law Dictionary* 931 (11th ed. 2019)).

[¶39] Mr. Armajo contends the two remaining statements were improper because they tended to inflame the jury's passions or prejudices. The State counters that the statements were reasonable argument based on the evidence.

[¶40] The prosecutor's statement that what Mr. Armajo did is "no different than when a priest in the Catholic Church administers confession but [it] is actually sexual assault" was patently improper because it specifically referenced the Catholic Church sex abuse scandals, a highly publicized and emotionally charged matter involving sexual abuse of children. It is disingenuous to suggest, as the State did at oral argument, that this could have been a reference to any religious ceremony. It was not. Though apparently attempting to draw a "ceremonial" analogy, the prosecutor improperly linked Mr. Armajo to those emotionally charged scandals notoriously tied to the Catholic Church. *See* Doug Norwood, *Prosecutorial Misconduct in Closing Argument* § 12.3, 385 (2014) ("It is improper for the prosecutor to make comparisons between the defendant's case and some notorious figure or case."); *see also Commonwealth v. Vazquez*, 65 Mass. App. Ct. 305, 311, 839 N.E.2d 343, 349 (2005) (concluding the prosecutor engaged in argument aimed at arousing the jury's passions or sympathies when she referenced the "whole church scandal" in arguing why the jury should not be concerned that the victim delayed reporting the sexual assaults).

[¶41] The prosecutor's final statement—"Child sex abuse perpetrators are [the] ones who choose. They choose where it happens."—was reasonable argument based on the evidence. ZL testified that it was unusual for Mr. Armajo to allow her mother to leave the house without him. The evidence reflected that he engaged in the sexual contact when he knew ZL's mother would not be home. From this evidence, the prosecutor reasonably argued that Mr. Armajo chose when and where the abuse would occur. To the extent the prosecutor generalized her argument to sexual abuse perpetrators, she invited the jury to use its common sense about who chooses where sexual abuse occurs—the perpetrator or the victim. *See Buszkiewic v. State*, 2018 WY 100, ¶¶ 12–16, 424 P.3d 1272, 1276–78 (Wyo. 2018) (concluding that, rather than making an improper "golden rule" argument, the prosecutor "requested that the jury consider the evidence using their life experiences and common sense").

## C. Cumulative Error

[¶42] We evaluate the prosecutor's two improper statements—"[T]his wasn't a ceremony and to call it such is despicable." and "It's no different than when a priest in the Catholic Church administers confession but [it] is actually sexual assault."—together to determine

whether, cumulatively, they prejudiced Mr. Armajo. "[A] series of . . . errors will only be cause for reversal where the accumulated effect constitutes prejudice and the conduct of the trial is other than fair and impartial." *Bogard*, ¶ 69, 449 P.3d at 332 (quoting *Sam*, ¶ 61, 401 P.3d at 855). "Each cumulative error analysis is unique" and requires "we evaluate the possibility of prejudice in the context of the entire record." *Id.* ¶ 70, 449 P.3d at 332 (citations omitted).

[¶43] Mr. Armajo argues the prosecutor's improper statements deprived him of a fair trial. He emphasizes that the improper statements were the last thing the jury heard from the attorneys before deliberations. He also asserts that the State's evidence was "threadbare."

[¶44] The *McGinn* factors identified above guide our analysis. *See Sam*, ¶ 66, 401 P.3d at 856; *Bogard*, ¶ 72, 449 P.3d at 332. We acknowledge at the outset the defense did not invite the misconduct. However, the misconduct was neither severe nor pervasive; it was confined to two fairly cursory statements during rebuttal closing. *See Schreibvogel v. State*, 2010 WY 45, ¶ 43, 228 P.3d 874, 888 (Wyo. 2010); *cf. Bogard*, ¶ 83, 449 P.3d at 335. Moreover, the improper statements were not significant to the central issue in the case: ZL's credibility. *See Sam*, ¶ 66, 401 P.3d at 856; *cf. Bogard*, ¶ 83, 449 P.3d at 335. It is true the State's case primarily hinged on ZL's testimony, but that does not mean the evidence was "threadbare," as Mr. Armajo suggests. ZL's testimony clearly supported the jury's verdict and the remaining witnesses, particularly ZL's mother, corroborated ZL's testimony about the circumstances leading up to, surrounding, and following the incident, thereby bolstering ZL's credibility and strengthening the State's case. In addition, the court sustained objections to each improper statement, lessening their potential prejudicial effect. *See James v. State*, 888 P.2d 200, 208 (Wyo. 1994) ("find[ing] no prejudice in the prosecutor's statement that appellant had spent four years corrupting the victim" where "[t]he trial court sustained appellant's objection to the comment and immediately declared it a misstatement of the facts").

[¶45] Considering the errors together on this record, and in light of the foregoing factors, we conclude that reversal is not warranted. Mr. Armajo's trial was fair and impartial.

## CONCLUSION

[¶46] The State presented sufficient evidence for the jury to find Mr. Armajo guilty of second degree sexual abuse of a minor. The prosecutor made two improper statements in rebuttal argument, but, considered together, those statements did not prejudice Mr. Armajo. We affirm.