# IN THE SUPREME COURT, STATE OF WYOMING

## 2022 WY 109

**APRIL TERM, A.D. 2022**

**September 9, 2022**

ANTHONY RODRIGUEZ,

Appellant
(Defendant),

v.

S-22-0013

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Natrona County*
*The Honorable Daniel L. Forgey, Judge*

*Representing Appellant:*

> *Office of the State Public Defender: Diane Lozano, Wyoming State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; H. Michael Bennett, Senior Assistant Appellate Counsel; Corthell and King, P.C., Laramie, Wyoming. Argument by Mr. Bennett.*

*Representing Appellee:*

> *Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames\*, Senior Assistant Attorney General. Argument by Mr. Eames.*

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

*\*An Order Allowing Withdrawal of Counsel was entered on August 1, 2022.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FOX, Chief Justice.**

[¶1]   A jury found Anthony Rodriguez guilty of second-degree murder and domestic battery. On appeal, he claims the prosecutors committed misconduct that deprived him of a fair trial. We affirm.

### *ISSUE*

[¶2]   The sole issue on appeal is whether the prosecutors' statements during opening statement and closing argument deprived Mr. Rodriguez of a fair trial.[1]

### *FACTS*

[¶3]   Anthony Rodriguez walked into the El Paso County Sheriff's Department in Colorado Springs, Colorado, to confess to the murder of his mother-in-law. In September, 2019, Mr. Rodriguez and his wife, Allison Solis, had moved in with her mother, Mary Fogle, in Casper, Wyoming. Ms. Fogle provided them a place to live, clothing, transportation, and food, though Ms. Solis and Mr. Rodriguez also used a food stamp card. Around mid-October, Ms. Fogle told them they needed to get jobs to help with expenses.

[¶4]   On the morning of November 17, 2019, the day of her death, Ms. Fogle went to a hair appointment. Ms. Fogle told her stylist that she could not afford to support Ms. Solis and Mr. Rodriguez anymore and she planned to tell them that "she was going to need both of them to get jobs and to either move out or help pay for things around the house."

[¶5]   While Ms. Fogle was at her appointment, Mr. Rodriguez and Ms. Solis were at her home. Ms. Solis heard Mr. Rodriguez tell a friend, "he has to get out of here and he was freaking out." He also said, "I don't trust these bitches," and "they are trying to set me up and send me to prison." Ms. Solis and Mr. Rodriguez argued, and she told him he was paranoid.

[¶6]   Ms. Fogle returned from her appointment, and at some point that day, a man arrived with a mattress she had arranged to have delivered for Mr. Rodriguez and Ms. Solis. Mr. Rodriguez got angry about the mattress because of its condition. Ms. Solis testified:

> Q.   Did you – what was his demeanor when the whole thing with the mattress was delivered?

---

[1] There were two prosecutors on the case—one made the opening statement and the other the closing argument.

A.     He was very angry. Like I said, he said that there was stains on it. He wasn't going to sleep on it. Just being very angry and irate.

Q.     Okay. Did your mom then call him on that?

A.     Yes, she did. She said, You need to calm down. You're in my house.

Q.     Okay. And how about you; did you call him on that? How did you – what did you think of his behavior?

A.     I didn't agree with it, but I really didn't say anything because I was used to it.

Q.     So the man then left with the mattress; is that correct?

A.     Yes, that's right.

[¶7]     Mr. Rodriguez and Ms. Fogle then began to argue about the right way to wash and dry a mattress cover. Mr. Rodriguez told her to leave him alone and that he could do what he wanted. Ms. Solis testified:

Q.     But did they get into a fight about that issue?

A.     Yes. So the last thing I remember was I was sitting on the couch and I overheard them arguing in the laundry room. So after he had taken it out of the washer, he was walking toward the back room, the one we were staying in. My mom had walked back there first. And I believe – I believe Anthony had the – he had it in his hand. And he was – so she went in there first, and he was following after her. And all of a sudden I hear my mom scream. And then I looked back. And then I jumped off the couch, jumped on him because I had tried to stop him from hitting my mom. And then he – he pushed me off of him, punched me in the face. He said – am I allowed to-

Q.     You're allowed to say it; yes, ma'am.

A.     He said, Sit the f*** down, shut the f*** up, bitch, before – before I kill you.

2

[¶8]   Ms. Solis testified that her mother was on the floor, on her back, while Mr. Rodriguez repeatedly punched her. She estimated that he struck her at least twenty times. She testified that he then slit her mother's throat, and while she was unconscious or dead, he rolled her onto her stomach, pulled her pants down past her knees and sexually assaulted her.

[¶9]   Ms. Solis testified that Mr. Rodriguez then told her to change her clothes "and to hurry because we have to get out of there." He threatened to kill her if she went for help and told her to grab her mother's purse, which contained her billfold, credit cards, and checkbooks. Mr. Rodriguez grabbed all the cell phones in the home, including Ms. Fogle's. The two then left in Ms. Fogle's car, and Mr. Rodriguez drove them to Colorado Springs.[2]

[¶10]  Mr. Rodriguez eventually called his aunt, who convinced him to turn himself in. He and Ms. Solis then went to the El Paso County Sheriff's Department in Colorado Springs. He told the person at the front desk, "I want to confess to murder, no bullsh**." That individual asked Mr. Rodriguez and Ms. Solis to wait in the lobby for deputies. Mr. Rodriguez made additional spontaneous statements, including, "I don't want to kill or hurt anyone," "Craziest sh** I've done in my life," and "Did all kinds of stupid sh**."

[¶11]  Deputy Kevin Sypher of the El Paso County Sheriff's Department was called to talk to Mr. Rodriguez. Deputy Sypher described Mr. Rodriguez's demeanor as "very calm, rather matter of fact." Deputy Sypher asked him who he killed, and Mr. Rodriguez said, "Mary Fogle." The deputy then asked where and when it happened and Mr. Rodriguez provided that information. Deputy Sypher did not ask additional questions. Detective Jon Price of the El Paso County Sheriff's Office took over the investigation. Deputy Sypher then briefly spoke with Ms. Solis and observed that she had a fresh cut on her lower lip.

[¶12]  Mr. Rodriguez and Ms. Solis were taken to Detective Price's office. He took photographs of Mr. Rodriguez, which documented swelling and bruising of his right knuckles, and some abrasions. Mr. Rodriguez had no other observable injuries, and he complained of no other injuries.

[¶13]  Detective Price then interviewed Mr. Rodriguez for approximately two hours. Mr. Rodriguez admitted killing Ms. Fogle and sexually assaulting her after killing her. During the interview, he did not claim Ms. Fogle attacked him, he did not accuse his wife of involvement in Ms. Fogle's death, and he stated the injuries to his right hand were from hitting Ms. Fogle and Ms. Solis.

[¶14]  The next morning, Detective Price again interviewed Mr. Rodriguez, this time accompanied by Sergeant Jonathan Peterson of the Casper Police Department. Mr.

---

[2] Before going to Colorado Springs, Mr. Rodriguez stopped in Denver, then drove to Walsenburg, to see his mother, and then to Pueblo, where they purchased and smoked marijuana.

Rodriguez again admitted to killing Ms. Fogle and made no claim that anyone else was involved or that he was acting in self-defense. He stated that he covered her body after killing her because he felt bad and did not want to see her. He also asked if they were going to offer him a plea deal.

[¶15] On November 19, 2019, the State charged Mr. Rodriguez with one count of second-degree murder. It later amended the information to charge him with one count of felony murder, one count of first-degree murder, and one count of domestic battery.

[¶16] Before his preliminary hearing, Mr. Rodriguez moved for an evaluation to determine his fitness to proceed, and the circuit court granted that motion. Dr. Alex Yufik, a forensic psychologist with the Wyoming State Hospital, evaluated Mr. Rodriguez on April 8, 2020, and submitted his report on June 4, 2020. Dr. Yufik diagnosed Mr. Rodriguez with a delusional disorder and substance use disorder but determined he was competent to stand trial and fit to proceed. He further concluded, "At present, there is no psychiatric reason to keep Mr. Rodriguez at any inpatient facility or hospital." Mr. Rodriguez agreed to forgo a competency hearing, stating he did not wish to contest Dr. Yufik's conclusion he was competent to proceed.

[¶17] The circuit court bound Mr. Rodriguez over to the district court. At arraignment, Mr. Rodriguez pled not guilty and not guilty by reason of mental illness or deficiency (NGMI). The district court ordered an evaluation to determine whether at the time of the alleged crime, as a result of mental illness or deficiency, he lacked substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

[¶18] Dr. Katherine Mahaffey, a forensic psychologist with the Wyoming State Hospital, performed the evaluation. Dr. Mahaffey diagnosed Mr. Rodriguez with: unspecified mood disorder; antisocial personality disorder with narcissistic and borderline personality traits; cannabis use disorder; methamphetamine use disorder; ADHD, by history; and conduct disorder, by history. Dr. Mahaffey was unable to diagnose a delusional disorder, because of inconsistencies and questionable veracity shown in her testing. She did conclude, however, that no delusional disorder was present at the time of the alleged crime. With respect to the antisocial personality disorder diagnosis, Dr. Mahaffey explained:

> So antisocial personality disorder is – again, it's a pervasive pattern that begins in early adulthood. With him, because of the conduct disorder, it actually begins in adolescence. That can involve some of the features involving being deceitful, being irresponsible, having problems with aggression, getting in fights, lacking empathy for other people, and engaging in behaviors that – that could lead someone to be

4

arrested – whether they get arrested or not, but behaviors that could lead to them being arrested.

[¶19]  As to Mr. Rodriguez's criminal responsibility, Dr. Mahaffey concluded:

> Based on all available information, it is this examiner's opinion that, at the time of the alleged offenses, Mr. Rodriguez did not suffer from a mental illness or mental deficiency so severely abnormal as to have grossly and demonstrably impaired his perception or understanding of reality. It can be stated with a reasonable degree of psychological certainty that, at the time of the alleged criminal conduct, Mr. Rodriguez did not lack substantial capacity, as a result of mental illness or deficiency, either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law.

[¶20]  After Dr. Mahaffey submitted her report, Mr. Rodriguez filed a witness list that designated Dr. Robert Pelc as an anticipated witness. The State objected on grounds that only a court-appointed examiner may evaluate a defendant for lack of mental responsibility for his crime, and Mr. Rodriguez failed to timely request a second evaluation following Dr. Mahaffey's report. Over the State's objection, the district court ordered that Dr. Pelc conduct a second evaluation to address the same questions presented to Dr. Mahaffey.

[¶21]  Dr. Pelc completed the requested evaluation and submitted a report. He diagnosed Mr. Rodriguez with: an unspecified personality disorder (with elements of paranoid personality, antisocial factors, and borderline personality disorder); and an unspecified substance use disorder. He concluded:

> Several factors are relevant in analysis of criminal responsibility. In this case, the claimant has an unspecified personality disorder with antisocial, borderline, and paranoid features. He also has an unspecified substance use disorder. Neither of these conditions would be consistent with someone experiencing a mental illness that significantly impairs judgment, behavior, or capacity to recognize reality or ability to cope with ordinary demands of life. While the defendant experiences anger and suspiciousness, these do not appear based in a psychotic disorder which would interfere with the defendant's capacity for rational thinking. Further, the current psychological evaluation produces substantial evidence of symptom exaggeration or malingering, which would conflict with a diagnosis of a condition in which his capacity for reality testing is impaired. While there is evidence of a significant

5

difficulty throughout his life which has resulted in prior involvement with the criminal justice system, there is an absence of information which would support the presence of delusional disorder or other forms of psychotic thinking at the time of the alleged offense.

Based on the current information, at the time of the alleged offense it would be this examiner's opinion that Mr. Rodriguez did not suffer from a mental illness or mental deficiency so severely abnormal as to have grossly and demonstrably impaired his perception or understanding of reality. Further at the time of his alleged offense, and within a reasonable degree of psychological certainty, the defendant did not lack substantial capacity as a result of a mental illness or deficiency either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law.

[¶22] Mr. Rodriguez testified at trial that on the day of Ms. Fogle's death, she threatened him with a pizza cutter, and the altercation that led to her death began when she came at him with a knife. He admitted that he punched her, but claimed he struck her only "four or five times tops." He also admitted he stabbed her one time in the chest but denied cutting her throat. He denied sexually assaulting her.

[¶23] Dr. Mahaffey testified consistent with her report, and she testified to Dr. Pelc's conclusions. Dr. Thomas Bennett, the forensic pathologist who performed Ms. Fogle's autopsy, also testified. Dr. Bennett outlined Ms. Fogle's injuries and testified that the injuries to her face were the result of "multiple, multiple" blows. He described her face as "very disfigured" and detailed the facial injuries.

Her nose is broken, broke those little thin bones at the top that your eyeglasses will sit on; plus tore the cartilage, the soft part of the nose, tore it completely off. So that is very pushed in and disfigured there. Bruising in this area has spread onto her right cheek. And her left eyelids, especially, are very, very bruised, evidence of impact to her nose, where it broke her nose. Her lips are severely lacerated, split the upper lip, tore the inside of the lip up against her teeth, lower lip the same way, tore the upper lip completely away from the upper jaw. And underneath this – I'm sure we'll talk about more later – but broke her jaw, has completely fractured so it's floating free. And then it broke again, so that the two upper incisors, your

6

two front upper teeth, floating free from the rest of it. So she had severe fractures.

[¶24] Dr. Bennett testified that the force necessary to cause Ms. Fogle's injuries was comparable to "a high-speed crash into a wall." He also testified that she suffered at least seven separate slash and cut wounds across her throat, and at least two deep stab wounds to the neck that left score marks on her vertebrae.

[¶25] The jury found Mr. Rodriguez guilty of second-degree murder in the death of Ms. Fogle, and domestic battery for the injury to Ms. Solis. It found him not guilty of first-degree murder (premeditated), and not guilty of first-degree murder (felony murder). The district court sentenced him to a prison term of seventy years to life for the murder and six months for the domestic battery, both with credit for time served. Mr. Rodriguez timely appealed.

## STANDARD OF REVIEW

[¶26] Mr. Rodriguez claims the prosecutors committed misconduct twice during the State's opening statement and twice during its closing argument. Because Mr. Rodriguez objected to each statement, we review for harmless error. *Armajo v. State*, 2020 WY 153, ¶ 33, 478 P.3d 184, 193 (Wyo. 2020) (citing *Bogard v. State*, 2019 WY 96, ¶ 18, 449 P.3d 315, 321 (Wyo. 2019)). "To demonstrate harmful error, the defendant must show prejudice under circumstances which manifest inherent unfairness and injustice or conduct which offends the public sense of fair play." *Armajo*, 2020 WY 153, ¶ 33, 478 P.3d at 193 (quoting *Dixon v. State*, 2019 WY 37, ¶ 40, 438 P.3d 216, 231 (Wyo. 2019)). "Allegations of prosecutorial misconduct are settled by reference to the entire record and 'hinge on whether a defendant's case has been so prejudiced as to constitute denial of a fair trial.'" *Byerly v. State*, 2019 WY 130, ¶ 20, 455 P.3d 232, 242 (Wyo. 2019) (quoting *Mraz v. State*, 2016 WY 85, ¶ 60, 378 P.3d 280, 294 (Wyo. 2016)).

*I.     The prosecutor's argument during the State's opening statement did not prejudice Mr. Rodriguez.*

[¶27] The first incident that Mr. Rodriguez claims as prejudicial misconduct occurred after the prosecutor told the jury it would hear evidence that Mr. Rodriguez told a friend he was acting in self-defense.

> But, ladies and gentlemen, you're going to learn that when the El Paso County authorities took the defendant's statement when he walked in, they called Casper, who did a home check; and they walked in – or excuse me. They tried to open the doors. The doors were all locked. The dog was gone. They further searched. Mary's purse was gone, her cell phone

7

was gone, her billfold was gone, all of her credit cards were gone, and her checkbooks were gone. They later found that that is what the defendant drove to Colorado when he tried to turn himself into the El Paso County Sheriff's Department. That is not, ladies and gentlemen, the acts of a man who killed somebody –

[DEFENSE COUNSEL]: Objection, Your Honor. That's argument.

THE COURT: Sustained as to the phrasing.

[PROSECUTOR]: We will introduce evidence, ladies and gentlemen, that you just don't do something like that when you're saying that you killed somebody in self-defense.

[¶28] The second incident that Mr. Rodriguez claims as prejudicial misconduct also occurred when the prosecutor was discussing Mr. Rodriguez's claim that he killed Ms. Fogle in self-defense.

They got into a fight about pizza, ladies and gentlemen. You're going to hear that, Oh, the defendant – he sent text messages to his friend Eric – Mary refuses to feed me. She didn't give me a piece of pizza. Well, we're going to introduce, ladies and gentlemen, that the pizza cutter never left the kitchen. It was still sitting right on the pizza pan. It still had pizza fragments all over it. And, ladies and gentlemen, a pizza cutter in the hands of a woman that's five feet five inches tall, 160 pounds, compared to 5'11", 190 pounds, isn't something that I think you're going to have to defend yourself with.

[DEFENSE COUNSEL]: Objection. That's argument.

THE COURT: Sustained.

[DEFENSE COUNSEL]: I move to strike.

THE COURT: I sustained the objection.

[DEFENSE COUNSEL]: I would ask for a mistrial, Your Honor.

[PROSECUTOR]: That's just evidence that we're – that's not a mistrial, Your Honor.

THE COURT: Go ahead.

[DEFENSE COUNSEL]: I would ask for a ruling, Your Honor.

THE COURT: We'll take it up at a later time.

[¶29]   Defense counsel renewed his request for a mistrial, and the district court denied the motion. It explained:

> All right. I'll just note that I sustained the objections when they were made to particular, what amounted to be, in my assessment, arguments. And I think that's sufficient. I don't think anything that occurred during opening would rise to the level that would require a mistrial or justify a mistrial at this time. So I'll deny the motion.

[¶30]   Mr. Rodriguez contends that the prosecutor committed misconduct by presenting argument during his opening statement. Argument in an opening statement is improper, *Whitney v. State*, 2004 WY 118, ¶ 86, 99 P.3d 457, 485 (Wyo. 2004), but not all argument rises to the level of prosecutorial misconduct. "Prosecutorial misconduct occurs when a prosecutor illegally or improperly attempts to persuade a jury 'to wrongly convict a defendant or assess an unjustified punishment.'" *Hartley v. State*, 2020 WY 40, ¶ 9, 460 P.3d 716, 719 (Wyo. 2020) (quoting *Bogard*, 2019 WY 96, ¶ 16, 449 P.3d at 320). We need not decide whether the prosecutor's argument in this case rose to that level because, in any case, the record cannot support a finding of the prejudice Mr. Rodriguez claims.

[¶31]   In determining prejudice, we balance the following factors: "1) the severity and pervasiveness of the misconduct; 2) the significance of the misconduct to the central issues in the case; 3) the strength of the State's evidence; 4) the use of cautionary instructions or other curative measures; and 5) the extent to which the defense invited the misconduct." *Klingbeil v. State*, 2021 WY 89, ¶ 44, 492 P.3d 279, 289 (Wyo. 2021) (quoting *McGinn v. State*, 2015 WY 140, ¶ 16, 361 P.3d 295, 299-300 (Wyo. 2015)).

[¶32]   As to the first factor, considering the prosecutor's statements in context, we are unable to conclude that they were either severe or pervasive. The prosecutor presented argument only twice in opening, and in both instances the statements were brief. Moreover, to the extent the prosecutor's argument depended on facts, evidence of those facts was admitted at trial, and Mr. Rodriguez has not suggested otherwise. *See Ross v. State*, 930

P.2d 965, 971 (Wyo. 1996) (upholding finding of no prejudice where evidence argued in opening was eventually delivered in admissible form).

[¶33]  Additionally, we have recognized that "the district court is in the best position to assess" the impact of alleged prosecutorial misconduct. *Teniente v. State*, 2007 WY 165, ¶ 27, 169 P.3d 512, 524 (Wyo. 2007); *see also Ross*, 930 P.2d at 971 ("[T]he trial judge is best situated to plumb the potential for injury arising from prosecutorial misconduct."). The court determined that sustaining defense counsel's objections was a sufficient response to the prosecutor's conduct, reflecting its view that the conduct was neither severe nor pervasive. *See Armajo*, 2020 WY 153, ¶ 44, 478 P.3d at 195 ("[T]he court sustained objections to each improper statement, lessening their potential prejudicial effect.").

[¶34]  The second factor, the significance of the misconduct to the central issues in the case, also weighs against finding prejudice. The prosecutor's improper argument concerned Mr. Rodriguez's self-defense claim, but he does not contend it prejudiced him in that defense.[3] He instead contends that the prosecutor's argument during his opening statement prejudiced him because it alluded to his mental state and thereby undermined his NGMI defense. We fail to see the connection. The prosecutor's arguments pointed to inconsistencies between Mr. Rodriguez's self-defense claim and the evidence. Even if they could be interpreted in some manner as an allusion to his mental state, the asserted connection between the arguments and Mr. Rodriguez's NGMI defense is simply too tenuous to support a finding of prejudice.

[¶35]  Turning to the fourth and fifth factors, it is clear that Mr. Rodriguez did not invite the alleged misconduct. As to the use of curative instructions, Mr. Rodriguez did not request any, and the district court did not provide any. The court did, however, instruct the jury, before opening statements, and again before closing arguments, that it was the exclusive judge of the facts, that those facts must be determined from the evidence, and that statements by counsel may not be regarded as evidence. *See Whitney*, 2004 WY 118, ¶ 92, 99 P.3d at 488 (general instruction that jury is to make findings based on evidence, not comments of counsel, lessened prejudice).

[¶36]  The most important factor is the third factor, the strength of the State's case. *Klingbeil*, 2021 WY 89, ¶ 46, 460 P.3d at 289; *Shields v. State*, 2020 WY 101, ¶ 40, 468 P.3d 1097, 1108 (Wyo. 2020). Under this factor, Mr. Rodriguez "must show 'it is reasonably probable he would have received a more favorable verdict if the error had not been made.'" *Klingbeil*, 2021 WY 89, ¶ 46, 492 P.3d at 289 (quoting *Leners v. State*, 2021 WY 67, ¶ 24, 486 P.3d 1013, 1018 (Wyo. 2021), *cert. denied*, 142 S.Ct. 410, 211 L.Ed.2d 220 (2021)).

---

[3] By the time of closing arguments, Mr. Rodriguez had substantially retreated from his self-defense claim.

[¶37] Mr. Rodriguez concedes that "there was no real question of who killed Ms. Fogle," but argues "there was a viable NGMI defense and a viable argument regarding premeditation." As to premeditation, the jury found Mr. Rodriguez not guilty of first-degree murder, so there plainly was no prejudice to that defense. As to his NGMI defense, Mr. Rodriguez failed to present evidence from which a jury could reasonably conclude that his mental condition excused his murder of Ms. Fogle. *See* Wyo. Stat. Ann. §§ 7-11-304 to 305 (LexisNexis 2021). It is therefore impossible for him to show a reasonable probability that he would have received a more favorable verdict but for the prosecutor's conduct.

[¶38] An NGMI defense is governed by statute, and the law presumes every defendant to be "mentally responsible." Wyo. Stat. Ann. § 7-11-305(b). Mr. Rodriguez had to disprove that presumption. *Gabbert v. State*, 2018 WY 69, ¶ 13, 420 P.3d 172, 175 (Wyo. 2018). He had "the burden of going forward and proving by the greater weight of evidence that, as a result of mental illness or deficiency, he lacked capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law." Wyo. Stat. Ann. § 7-11-305(b). A mental illness or deficiency means "only those severely abnormal mental conditions that grossly and demonstrably impair a person's perception or understanding of reality . . . ." Wyo. Stat. Ann. § 7-11-304(a).

[¶39] The evidence was overwhelming that when Mr. Rodriguez committed his crimes, he was not suffering a severely abnormal mental condition, and he understood the wrongfulness of his conduct. The jury heard the opinions of both Drs. Mahaffey and Pelc to that effect, and Mr. Rodriguez offered no contrary expert opinion. Additionally, Mr. Rodriguez's behavior immediately after the crime confirmed that he understood the wrongfulness of his conduct. He fled the state in Ms. Fogle's vehicle with her purse, billfold, credit cards, and checkbook, and he told authorities he felt bad for killing Ms. Fogle and requested a plea deal. *See Gabbert*, 2018 WY 69, ¶ 19, 420 P.3d at 177-78 (citing flight and awareness of consequences as evidence defendant understood wrongfulness of conduct).

[¶40] The evidence was likewise overwhelming that Mr. Rodriguez was able to conform his conduct to the requirements of the law. Again, the jury heard the opinions of both Drs. Mahaffey and Pelc to that effect, and Mr. Rodriguez offered no contrary expert opinion. Additionally, Mr. Rodriguez testified that he was able to comply with the rules of the road when driving to Colorado, and to various locations in Colorado, showing his ability to conform his conduct to the requirements of the law. The same can be said for his decision to flee in Ms. Fogle's vehicle instead of his own. He testified:

> Q.   Well, you said you were trying to do everything law abiding, and that's why you didn't use your Volvo; right?
>
> A.   Yeah.

> Q. Because it had expired plates and no insurance and things?
>
> A. Uh-huh.

[¶41] The only evidence Mr. Rodriguez points to in support of his NGMI defense is his own testimony. He does not cite to any particular testimony but instead suggests the testimony overall supported his defense because it "was so disjointed." Mr. Rodriguez's testimony was indeed disjointed at times, and at times nonresponsive. There was no evidence from which the jury could conclude that Mr. Rodriguez's testimony was the byproduct of a severely abnormal mental condition. Nor did his behavior during trial provide the jury with any evidence from which it could conclude that at the time of his crimes, it was impossible for him to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law.

[¶42] We rejected a similar argument in favor of an NGMI defense in *Haddock v. State*, 909 P.2d 974 (Wyo. 1996). In that case, the defendant pled guilty to credit card fraud and forgery and then moved to withdraw his plea on grounds that he had a valid NGMI defense and had not been competent to enter his plea. *Id.* at 975-76. He cited his behavior during the presentence investigation, and his unusual testimony when he entered his guilty plea, as evidence of his mental state.

> Appellant maintains that the presentence investigation report supported his claim that he was emotionally unstable. The presentence investigation report indicated that Appellant was suffering from extreme stress and that he may have been experiencing psychological difficulties at the time when the probation agent interviewed him. The report stated that Appellant believed that he was being harassed by law enforcement officials and that, while he was previously incarcerated at the Wyoming State Penitentiary, a monitoring device had been placed in his leg during a surgical procedure. The report further stated that Appellant believed that the monitoring device was being used to track him and was causing unusual magnetic occurrences. Appellant also claims that his testimony which he gave when he entered his guilty pleas reflected his emotional instability. He testified that he took the credit cards and the check so that he could force his parents to give him certain family information.

*Id.* at 976.

12

[¶43]  We upheld the district court's denial of the defendant's motion to withdraw his plea, concluding that he had failed to present reliable evidence of a mental illness or deficiency.

> The probation agent's observations which were included in the presentence investigation report described Appellant's mental state at the time when the presentence investigation interview was being conducted and did not pertain to Appellant's state of mind when he committed the crimes or when he pleaded guilty. Similarly, although Appellant's testimony may have shown that he harbored unusual motives for his crimes, the testimony was not the type of evidence which would sustain a mental illness or deficiency defense.

*Id.* at 976; *see also Delgado v. State*, 2022 WY 61, ¶ 34, 509 P.3d 913, 924 (Wyo. 2022) (evidence must relate to defendant's mental state at time of crime).

[¶44]  Given the lack of evidence to support Mr. Rodriguez's NGMI defense, it is not reasonably probable that the verdict would have been different in the absence of the State's argument in opening. Any error in the opening statement was therefore harmless. *See Mendoza v. State*, 2021 WY 127, ¶ 20, 498 P.3d 82, 87 (Wyo. 2021) (rejecting claim of harm in prosecutor's alleged misstatement of self-defense law where defense was "weak, at best").

## II.    *The prosecutor's comments during closing argument did not prejudice Mr. Rodriguez.*

[¶45]  Defense counsel ended his closing argument by referring to Mr. Rodriguez's demeanor at trial and arguing to the jury that his demeanor was evidence of his delusional disorder. The prosecutor then gave his rebuttal argument:

> [PROSECUTOR]:  Ladies and gentlemen, he should get an Emmy.
>
> [DEFENSE COUNSEL]:  Objection, Your Honor. That is improper argument. That's attacking the defendant over the shoulders of the defense counsel.
>
> THE COURT:      Overruled.
>
> .   .   .
>
> [PROSECUTOR]: We talked about malingering and feigning. There's quite a bit of testimony about that.

13

Ladies and gentlemen, the defendant is guilty.

[DEFENSE COUNSEL]: Objection, Your Honor. The instructions specifically say he is not guilty until the jury deliberates and returns its verdict. That is a misstatement of the law. And to say that he is guilty is an example of prosecutorial misconduct.

[PROSECUTOR]: Judge, I'm making a closing argument. Going over the three charges, I believe they should return a verdict of guilty.

[DEFENSE COUNSEL]: Your Honor, he can say, You should find him guilty; but he cannot say he is guilty. That is an improper argument. And I – it's – it's clearly prosecutorial misconduct for him to say the defendant is guilty.

THE COURT: I'll sustain based on the phrasing, although there are other ways to make that argument.

[¶46] Because Mr. Rodriguez cannot make the most important showing under our prejudice analysis, we need not address whether the prosecutor's statements constituted misconduct. Mr. Rodriguez again only claims prejudice to his NGMI defense, and as we concluded above, that was not a viable defense. Mr. Rodriguez presented no evidence from which a jury could reasonably conclude that, at the time of the murder, he suffered a severely abnormal mental condition that made it impossible for him to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law. Mr. Rodriguez is unable to show "it is reasonably probable he would have received a more favorable verdict if the error had not been made." *Klingbeil*, 2021 WY 89, ¶ 46, 492 P.3d at 289.

[¶47] Affirmed.