# THE SUPREME COURT, STATE OF WYOMING

# 2023 WY 75

### APRIL TERM, A.D. 2023

### July 28, 2023

JUSTIN BERRY,

**Appellant**
**(Defendant),**

**v.**

THE STATE OF WYOMING,

**Appellee**
**(Plaintiff).**

S-22-0255

*Appeal from the District Court of Uinta County*
*The Honorable Joseph B. Bluemel, Judge*

*Representing Appellant:*
> H. Michael Bennett, Corthell and King Law Office, P.C., Laramie, Wyoming.

*Representing Appellee:*
> Bridget L. Hill, Attorney General; Jenny L. Craig, Deputy Attorney General; Kristen R. Jones, Senior Assistant Attorney General; John J. Woykovsky, Senior Assistant Attorney General. Argument by Mr. Woykovsky.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY and FENN, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FENN, Justice.**

[¶1]   Following a jury trial, Justin Berry was convicted of one count of aggravated cruelty to animals.  He challenges his conviction arguing it was reversible error to allow his wife to invoke spousal privilege in front of the jury, the district court erred in admitting certain evidence, and he was prejudiced by prosecutorial misconduct.  In addition, Mr. Berry claims the district court violated his right against self-incrimination under the Federal and Wyoming Constitutions when it ordered him to participate in the preparation of a presentence investigation as a condition of his bond.  We affirm.

## ISSUES

[¶2]   Mr. Berry raises five issues which we rephase and consolidate as follows:

> I.   Did the district court commit reversible error when it allowed Mrs. Berry to invoke spousal privilege in the presence of the jury?
>
> II.  Did the district court abuse its discretion when it admitted testimony and evidence from a witness who was not disclosed pretrial?
>
> III. Did the prosecutor engage in prosecutorial misconduct?
>
> IV.  Did being ordered to participate in the preparation of a presentence investigation under Wyoming Statute § 7-13-303 (LexisNexis 2021) and Rule 32 of the Wyoming Rules of Criminal Procedure violate Mr. Berry's right against self-incrimination under the Federal and Wyoming Constitutions?

## FACTS

**The Investigation and Charges**

[¶3]   Kay Dunford and his wife raise thoroughbreds and quarter horses that they race in Gillette, Rock Springs, and Evanston, Wyoming.  In June 2020, Mr. Dunford placed four of his broodmares and their young foals on property he subleases from Bernadette Beaslin on Wasatch Road in Uinta County, Wyoming.  Ms. Beaslin leases this land from the Union Pacific Railroad.

[¶4]   The last week of June 2020, Mr. Dunford noticed one of the mares, Less Stress, behaving oddly.  He moved her to a closer pasture to keep an eye on her and her foal.  Mr.

1

Dunford checked on Less Stress multiple times a day and gave her antibiotics to see if her health would improve. He did not have Less Stress examined by a veterinarian at that time.

[¶5]    On July 1, 2020, when Mr. Dunford went to the leased property to feed the other mares, he found one of the mares, Red River Romance, dead on the other side of the fence. Mr. Dunford initially thought the horse had been struck by lightning. Mr. Dunford called his veterinarian, Dr. James Bechaver, to examine Red River Romance. Dr. Bechaver initially thought the horse died from colic, which refers to any type of pain in the abdomen of a horse. Mr. Dunford used a forklift to lift Red River Romance back over the fence and place her on her right side. Mr. Dunford and Dr. Bechaver observed a puncture wound in the horse's side with blood running down her ribcage and the back of her left front leg. Dr. Bechaver suspected the puncture wound was from a small caliber bullet. When they realized Red River Romance had been shot, they contacted law enforcement.

[¶6]    While they were waiting for law enforcement to arrive, Mr. Dunford and Dr. Bechaver noticed another mare in the pasture, Little Fibber, also had a trickle of blood coming from a bullet wound in her hip. The bullet was lodged in an area that was too dense to x-ray. Dr. Bechaver did not attempt to remove the bullet because it would have caused more harm than leaving it in. Dr. Bechaver gave Little Fibber a tetanus shot and antibiotics to treat any potential infection. Little Fibber's wound was of the same freshness as Red River Romance's wound, leading Dr. Bechaver to conclude the horses were shot around the same time.

[¶7]    Dr. Bechaver waited until a deputy from the Uinta County Sheriff's Office arrived before performing the necropsy on Red River Romance. During the necropsy, Dr. Bechaver discovered the bullet wound went through Red River Romance's left lung. He also discovered her entire chest cavity was filled with blood, leading him to conclude she died within half an hour of being shot. Dr. Bechaver recovered the bullet from Red River Romance and turned it over to law enforcement.

[¶8]    After discovering Red River Romance and Little Fibber had been shot, Dr. Bechaver went to the other pasture to examine Less Stress. Less Stress was running a high fever, appeared to be losing weight, and her heart rate and respirations were rapid, which indicated she was in pain. At that time, he did not see any obvious signs of a gunshot wound. Dr. Bechaver took a culture from Less Stress and discovered she was suffering from an infection called peritonitis.

[¶9]    Less Stress died on July 5, 2020, and Dr. Bechaver performed a necropsy on her the following day. When he opened her abdomen, he discovered signs of inflammation and infection. He found two bullets lodged in the horse's cecum, which is the junction of the small and large intestines. The bullets caused her digestive system to shut down in the seven-to-ten days prior to her death. He was able to remove the bullets from her abdomen, which he provided to law enforcement. The bullets taken from Less Stress appeared to be

similar to the bullet removed from Red River Romance.  All three bullets appeared to be .22 caliber bullets.

[¶10]  On July 3, 2020, deputies were patrolling Wasatch Road when they encountered one of Mr. Dunford's employees, Kim Putnam, who was feeding Mr. Dunford's horses.  Mr. Putnam informed the deputies he was fixing a fence on the Dunford property in early May when a male came out of a stucco house on Wasatch Road and started yelling and cursing at him.  Mr. Putnam told the deputies the man lived in the stucco house and drove a white truck.  Mr. Putnam stated shortly after the man yelled at him, he heard what sounded like a gunshot from a .22 caliber gun coming from the direction of the stucco house.  Mr. Putnam did not report the incident because he did not think anyone would believe him.  The deputies looked around Wasatch Road and due to the terrain of the area, they believed the horses were shot by someone living or having access to the properties in the vicinity of the stucco house.  They learned the white truck mentioned by Mr. Putnam was registered to Justin and Erin Berry who lived in the stucco house.

[¶11]  Deputy Kerby Barker applied for a search warrant to search Mr. Berry's home.  The following day, Deputy Barker and four other members of the Uinta County Sherriff's Office executed the search warrant on Mr. Berry's home.  When the officers arrived, Mr. Berry was home with his young daughter, SB, and his friend, Anthony Holmes, who was a frequent visitor at the Berry home.  Mr. Berry's wife arrived shortly thereafter, before the search had taken place.

[¶12]  The officers searched Mr. Berry's home for firearms between .17 and .23 in caliber and ammunition similar to what was recovered from the horses.  During the search, Mr. Berry admitted he had shot a .22 caliber firearm on his property, although he denied shooting at the horses.  The deputies seized eight firearms from Mr. Berry's residence and multiple types of .22 caliber ammunition.  Four of the seized firearms were .22 caliber, including a Ruger 10/22 rifle that was found in the pantry of the residence.  The Ruger 10/22 rifle had two bullets in it, one in the chamber and one in the magazine.  The bullets were CCI subsonic or "Super Quiet" rounds that were consistent with those recovered from the horses.  The deputies also found three spent shell casings on the deck of Mr. Berry's home.

[¶13]  The bullets recovered from the horses, the spent shell casings, and the four .22 caliber firearms taken from Mr. Berry's residence were sent to the State Crime Lab.  The Crime Lab determined the Ruger 10/22 rifle fired the two bullets recovered from Less Stress and all three of the spent shell casings.  While the Crime Lab could not match the bullet removed from Red River Romance to the Ruger 10/22 rifle, it was able to eliminate the other .22 caliber firearms taken from Mr. Berry's home.  In March 2021, the State charged Mr. Berry with three counts of aggravated cruelty to animals, one count each for Less Stress, Red River Romance, and Little Fibber.

**Spousal Privilege**

[¶14] While the deputies were executing the search warrant, Mr. Berry's wife, Erin Berry, told one of them there had been some issues with the neighbors who leased the property behind their home. She stated Mr. Berry was angry about a rumor 150 horses were going to be placed on the leased property. She also confirmed Mr. Berry "exchanged words" with Mr. Putnam a month or two earlier.

[¶15] A few days before Mr. Berry's trial was scheduled to begin, an attorney entered an appearance on behalf of Mrs. Berry "for the purpose of representing the proposed witness." The day before Mr. Berry's trial, the district court addressed the issue of Mrs. Berry's testimony at a hearing on an unrelated motion. At that time, the district court was concerned Mrs. Berry might invoke her Fifth Amendment right to remain silent. The district court asked the parties to advise him in advance if they were going to call Mrs. Berry so he could advise her of her Fifth Amendment rights outside the presence of the jury.

[¶16] The State indicated it reached out to Mrs. Berry to address this issue, but Mrs. Berry declined to speak to the prosecutor. Mrs. Berry's attorney contacted the State indicating Mrs. Berry intended to assert spousal privilege, not the Fifth Amendment. The State believed if Mrs. Berry invoked spousal privilege, neither party could call her as a witness. However, if Mr. Berry called Mrs. Berry to testify on his behalf, "then that waives the privilege so that the State can then inquire to her." The State then said:

> And so, if that is the indication, the State is not going to present a witness that comes to the stand and exercises that spousal privilege, and would note that we would comply with the law if that is waived, when and if that occurs.

The district court asked the State if it wanted Mrs. Berry to appear and exercise spousal privilege on the record outside the presence of the jury. The State indicated it believed Mrs. Berry's attorney's statement as an officer of the court was sufficient. The district court asked defense counsel if he had anything to add on that issue. Defense counsel indicated he did not intend to call Mrs. Berry as a witness. The district court advised the parties they needed to inform him if they decided to call Mrs. Berry so he could advise her of her rights outside the presence of the jury to avoid reversible error.

[¶17] In his opening statement, Mr. Berry asserted there were three other suspects who had access to the Ruger 10/22 rifle and could have shot the horses. Those other suspects included Mrs. Berry, SB, and Mr. Holmes. He also informed the jury it was Mrs. Berry who purchased the Ruger 10/22 rifle.

[¶18] At the end of the first day of trial, the State informed the district court it had

4

reconsidered its position about Mrs. Berry's testimony. Based on Mr. Berry's opening statement, the State now saw "some merit" to having her assert spousal privilege in front of the jury because the jury might now question why Mrs. Berry was absent from the trial. The district court asked the State if spousal privilege needed to be exercised outside the presence of the jury like the Fifth Amendment. The State indicated it needed to research this issue because it did not want to create reversible error. The district court gave the parties the opportunity to file briefs on this issue.

[¶19] The State filed its brief the following morning. Mr. Berry did not file a brief. The State asserted case law required the district court to determine whether Mrs. Berry could invoke spousal privilege outside the presence of the jury. However, once the district court made that determination, there was no rule or case law that prevented the witness from asserting the privilege in front of the jury. The State suggested Mrs. Berry be called to the stand and allowed to invoke spousal privilege before the jury. The State proposed the district court could then give a limiting instruction informing the jury Mrs. Berry was not an available witness for either party.

[¶20] When the district court asked defense counsel for his position on the matter, he stated: "Your Honor, I'm in agreement with what [the State] set forth on the record. And I have no objection to her calling [Mrs.] Berry out of turn. That's essentially all I have to say about the matter." The district court specifically asked defense counsel if Mr. Berry would be prejudiced by Mrs. Berry invoking spousal privilege in front of the jury. Defense counsel stated: "I don't believe that's prejudicial. . . ." When given a second opportunity to object, defense counsel stated: "I have no issue with [Mrs.] Berry entering spousal privilege or claiming spousal privilege and refusing to testify today in front of the jury."

[¶21] The State called Mrs. Berry to the stand, and she testified she was married to Mr. Berry and was invoking her spousal testimonial privilege. Defense counsel asked her to confirm she was invoking the privilege in relation to the defense's case as well as the State's. The district court did not allow either party to ask Mrs. Berry any other questions, and it released her from her subpoena. The parties agreed the district court should instruct the jury that Mrs. Berry was not an available witness for either party. After some discussion about the form of the instruction, the parties stipulated to the district court giving the following instruction:

> Erin Berry, Defendant Justin Berry's spouse, has exercised the privilege of spousal immunity against both parties and has made herself unavailable as a witness for both the state and the Defense.

**Evidence Regarding the Lease of the Property Where the Horses Were Shot**

[¶22]   Just before opening statements, defense counsel raised the issue of whether the State could prove the horses were authorized to be on the property where they were shot.  He argued the State could not present any testimony about the "lease agreement between the Dunfords and the railroad" because the State did not provide the lease agreement in discovery.[1]  He asserted under the best evidence rule, Rule 1002 of the Wyoming Rules of Evidence (W.R.E.), the State had to introduce the lease agreement to prove the contents of the document.  The State argued Mr. Berry waived this issue because he had not filed a motion under Rule 12 of the Wyoming Rules of Criminal Procedure (W.R.Cr.P.), and such a motion was now untimely.  The State further argued it could present testimony that the horses were authorized to be on the property, and it did not need to prove what was in the four corners of the lease agreement under the best evidence rule.  The district court denied Mr. Berry's motion to preclude the State from presenting testimony about the lease agreement.

[¶23]   In stark contrast to this argument, Mr. Berry told the jury in his opening statement he did not dispute the horses were authorized to be on the property where they were shot. He informed the jury the only element of the charges he contested was whether he was the one who shot the horses.  He asserted the State did not do a thorough investigation, and it would not be able to prove he was the one who pulled the trigger.

[¶24]   When Mr. Dunford was on the stand, he testified he subleases the 15-acre pasture where the horses were when they were shot from Ms. Beaslin, who in turn leases the property from the Union Pacific Railroad, and he pays her $80 a year for that lease.  He also testified the horses were on that pasture with his authority.  After Mr. Dunford's testimony, the State informed the district court it obtained a copy of the lease agreement between Ms. Beaslin and the Union Pacific Railroad from Mr. Dunford, and it would provide a copy of the lease to Mr. Berry during the recess.  The State argued Mr. Dunford's testimony established the lease agreement exists between the Union Pacific Railroad and Ms. Beaslin, and if there were any other issues that needed to be addressed, Ms. Beaslin could testify, if the district court would permit her to testify electronically.  Mr. Berry chose not to put anything else on the record regarding this issue.

[¶25]   Later in the trial, the State requested Ms. Beaslin be allowed to testify by phone to provide foundation and information related to the lease.  Defense counsel stated: "No objection to Ms. Beaslin testifying by telephone."  When the State called Ms. Beaslin as a witness, Mr. Berry did not object.  Ms. Beaslin testified her husband leased the property from the Union Pacific Railroad prior to his death, and she continued to lease the property. She further testified Mr. Dunford subleases the property from her to use for his horses.  The State sought to admit what was described as a duplicate check to show Ms. Beaslin paid the Union Pacific Railroad $250 for a five-year lease.  Mr. Berry objected to this exhibit

---

[1] This was a misstatement of the facts.  As set forth above, Ms. Beaslin leases the land from the Union Pacific Railroad, and Mr. Dunford subleases the land from Ms. Beaslin.

6

because it was not timely provided in discovery. The district court overruled the objection and admitted the exhibit "for whatever value it is." Ms. Beaslin then testified the horses were on the leased property with her permission. Mr. Berry did not ask Ms. Beaslin any questions.

[¶26] In his closing argument, Mr. Berry told the jury he was contesting whether the horses had authority to be on the property. However, this argument had nothing to do with the lease agreement. Instead, Mr. Berry argued there was no proof there was a fence that divided the Berry property from the leased property. He argued:

> [W]ho is to say that the horses did not wander off to Justin Berry's property and get shot by one of the four people on Justin Berry's property while they were on Justin Berry's property and then mosey back to Kay Dunford's property? There is no evidence that that did not occur. There's no proof that that did not occur. And it's a complete and entire possibility. Yet another reason to doubt. Another reason to doubt that Justin Berry is guilty of this crime.

**The Verdict and Sentence**

[¶27] The jury found Mr. Berry guilty of aggravated animal cruelty in relation to Less Stress, but it found him not guilty of aggravated animal cruelty in relation to Red River Romance and Little Fibber. Mr. Berry was sentenced to not less than one nor more than two years in prison. This appeal timely followed.

## DISCUSSION

### I. *Did the district court commit reversible error when it allowed Mrs. Berry to invoke spousal privilege in the presence of the jury?*

[¶28] Mr. Berry asserts the district court erred when it allowed the State to call Mrs. Berry to the stand to invoke spousal privilege in the presence of the jury. The State argues Mr. Berry waived any objection to this alleged error. We agree with the State that Mr. Berry waived this issue because his conduct created the situation he now asks us to review.

> We reject attempts by a defendant to turn a trial strategy into an appellate error. The doctrine of invited error prohibits a party from raising on appeal alleged trial court errors that were induced by that party's actions. When a party affirmatively waives a right or objection, we do not review it; however, when a party merely forfeits a right or objection, we review for plain error. Waiver is the intentional relinquishment or

7

abandonment of a known right, while forfeiture is the failure to make a timely assertion of a right. Waiver requires something more affirmative than simple agreement.

*Tarpey v. State*, 2023 WY 14, ¶ 50, 523 P.3d 916, 931 (Wyo. 2023) (internal citations and quotation marks omitted).

[¶29] The record shows Mr. Berry did more than "merely agree" to Mrs. Berry invoking spousal privilege in front of the jury. Defense counsel affirmatively endorsed the State's proposed procedure and affirmatively represented to the district court that Mr. Berry would not be prejudiced. *See Mackley v. State*, 2021 WY 33, ¶¶ 12–16, 481 P.3d 639, 642–43 (Wyo. 2021) (finding the defendant intentionally relinquished a known right when defense counsel twice affirmatively endorsed an incorrect jury instruction and declined the opportunity to correct it). Despite the district court's invitation, Mr. Berry did not file a brief, argue Mrs. Berry needed to invoke spousal privilege outside the presence of the jury, or propose any alternative method for handling Mrs. Berry's invocation of spousal privilege. We find Mr. Berry abandoned a known right and waived this issue. *See Jackson v. State*, 2019 WY 81, ¶ 11, 445 P.3d 983, 987–88 (Wyo. 2019) (holding the defendant waived review of the alleged error under the invited error doctrine when the defendant "created the very situation he now asks us to review[.]").

## II. Did the district court abuse its discretion when it admitted testimony and evidence from a witness who was not disclosed pretrial?

[¶30] Mr. Berry asserts the district court abused its discretion when it allowed Ms. Beaslin to testify and admitted the duplicate check into evidence. He argues "[t]he lease agreement in question here was necessary to prove an element of the charged crimes, specifically that the horses were on property where they were authorized to be." He argues he was prejudiced by the admission of this evidence because it "allowed the State to prove an essential element of the crimes without giving [him] adequate time to conduct his own investigation[.]" The State asserts Mr. Berry was not prejudiced by the admission of this evidence because it was cumulative of other testimony, and the record shows Mr. Berry was not surprised.

[¶31] "We review a district court's ruling on the admissibility of evidence . . . for an abuse of discretion." *Thompson v. State*, 2021 WY 84, ¶ 15, 491 P.3d 1033, 1039 (Wyo. 2021) (quoting *Jontra Holdings Pty Ltd v. Gas Sensing Tech. Corp.*, 2021 WY 17, ¶ 58, 479 P.3d 1222, 1239 (Wyo. 2021)). "A district court 'abuses its discretion when it could not have reasonably concluded as it did.'" *Id.* (quoting *Majors v. State,* 2011 WY 63, ¶ 11, 252 P.3d 435, 439 (Wyo. 2011)). "A trial court's rulings on the admissibility of evidence are entitled to considerable deference, and, as long as there exists a legitimate basis for the trial court's ruling, that ruling will not be disturbed on appeal." *Mayhew v. State*, 2019 WY 38, ¶ 23, 438 P.3d 617, 623 (Wyo. 2019) (quoting *Swett v. State*, 2018 WY 144, ¶ 11, 431 P.3d 1135,

8

1140 (Wyo. 2018)). "If we find the evidence was admitted in error, then we consider whether the error was prejudicial." *Thompson*, ¶ 15, 491 P.3d at 1039 (citing *Mitchell v. State,* 2020 WY 142, ¶ 17, 476 P.3d 224, 231 (Wyo. 2020)). An "[e]rror is prejudicial if there is a reasonable possibility that the verdict might have been more favorable to the defendant if the error had not been made. Prejudicial error requires reversal, while harmless error does not." *Id.* at ¶ 28, 491 P.3d at 1042 (quoting *Vinson v. State*, 2020 WY 93, ¶ 24, 467 P.3d 1009, 1014 (Wyo. 2020)). Mr. Berry has the burden to establish an abuse of discretion and prejudice. *Blair v. State*, 2022 WY 121, ¶ 17, 517 P.3d 597, 601 (Wyo. 2022) (citing *Kincaid v. State*, 2022 WY 4, ¶¶ 31–32, 501 P.3d 1257, 1263 (Wyo. 2022)).

[¶32] Mr. Berry did not object to Ms. Beaslin's testimony, and he stipulated to her testifying by phone. Mr. Berry has not cited to any case law requiring the district court to sua sponte preclude an undisclosed witness from testifying. The district court could have reasonably concluded Mr. Berry did not object to the admission of this testimony, especially given his stipulation to her appearing by phone. Mr. Berry has not shown the district court abused its discretion when it allowed Ms. Beaslin to testify without any objection from the defense.

[¶33] Mr. Berry also cannot show he was prejudiced by the admission of Ms. Beaslin's testimony or the duplicate check because neither this evidence nor the lease agreement was necessary to establish an essential element of the crime. Mr. Berry's argument is based on a misunderstanding of the best evidence rule. "Proof of each element of a crime can be [established] by either direct or circumstantial evidence, and circumstantial evidence includes inferences reasonably drawn from the evidence." *Beane v State*, 596 P.2d 325, 327 (Wyo. 1979) (citing *Cloman v. State*, 574 P.2d 410, 416 (Wyo. 1978)). The best evidence rule, W.R.E 1002, "require[s] an original [to be introduced] when the objective at trial is to prove the content of a writing." *Adams v. State*, 2005 WY 94, ¶ 25, 117 P.3d 1210, 1218 (Wyo. 2005) (citing W.R.E. 1002)). In this case, there was no need to prove the content of a writing. While the State needed to prove the horses were on property where they were authorized to be when they were shot, it did not need to prove the exact terms of the lease agreement to establish this element of the crime. *See* Wyo. Stat. Ann. § 6-3-203(c)(vii) (LexisNexis 2019), *repealed by* 2021 Wyo. Sess. Laws ch. 30, § 3. As McCormick on Evidence explains:

> There are writings, recordings and photographs, essentially unlimited in variety, which record the facts of out-of-court actions and events. When the proponent is trying to prove the happening of such past events, the best evidence rule does not demand that such documents be used. The substantive law does not regard the document as the essential or primary repository of these events. Testimony by a witness with independent firsthand knowledge that describes such events is primary, not secondary, evidence. It is not being offered to

> prove the contents of a document just because a documentary record also exists. In such cases, testimony is permitted under the best evidence rule and there is no need to produce the original documentary record, or to explain its absence.

2 McCormick on Evidence § 234 (8th ed. July 2022). The State could prove the out-of-court event, Mr. Dunford's sublease of the property, through the testimony of a witness with "independent firsthand knowledge." Mr. Dunford was a party to the sublease and had independent firsthand knowledge of its existence. His testimony was sufficient to establish the horses were authorized to be on the property, and there was no need to produce the lease agreement or the duplicate check. *See Beane*, 596 P.2d at 327 (holding a warehouse manager's testimony was sufficient to establish ownership and lawful possession of the premises in a burglary case). Because Mr. Dunford's testimony was sufficient to prove this element, Mr. Berry has not shown there is a reasonable probability the verdict would have been more favorable to him if Ms. Beaslin's testimony and the duplicate check had not been admitted.

### III.    *Did the prosecutor engage in prosecutorial misconduct?*

[¶34]  Mr. Berry asserts the prosecutor engaged in misconduct during his trial by allowing Mrs. Berry to invoke spousal privilege in front of the jury, vouching for the Uinta County Sheriff's Office and a Crime Lab expert, attempting to shift the burden of proof, and making inappropriate statements in her closing argument. The State asserts Mr. Berry's argument fails because the alleged instances were either not misconduct or were not prejudicial.

[¶35] "Prosecutorial misconduct occurs when a prosecutor illegally or improperly attempts to persuade a jury 'to wrongly convict a defendant or assess an unjustified punishment." *Armajo v. State*, 2020 WY 153, ¶ 32, 478 P.3d 184, 193 (Wyo. 2020) (quoting *Hartley v. State*, 2020 WY 40, ¶ 9, 460 P.3d 716, 719 (Wyo. 2020)). Mr. Berry "bears the burden of establishing prosecutorial misconduct." *Id.* (quoting *Bogard v. State*, 2019 WY 96, ¶ 16, 449 P.3d 315, 321 (Wyo. 2019)).

[¶36]  Mr. Berry only objected to one of these alleged errors below. We review that alleged error for harmless error, "after first determining if error occurred." *Id.* at ¶ 33, 478 P. 3d at 193 (citing *Bogard*, ¶ 18, 449 P.3d at 321). "To demonstrate harmful error, the defendant must show prejudice under circumstances which manifest inherent unfairness and injustice or conduct which offends the public sense of fair play." *Id.* (quoting *Dixon v. State*, 2019 WY 37, ¶ 40, 438 P.3d 216, 231 (Wyo. 2019)). "In determining whether [Mr. Berry] was prejudiced, we review the entire record." *Klingbeil v. State*, 2021 WY 89, ¶ 44, 492 P.3d 279, 289 (Wyo. 2021) (quoting *Hathaway v. State*, 2017 WY 92, ¶ 33, 399 P.3d 625, 634–35 (Wyo. 2017)).

10

[¶37] We review the alleged errors to which Mr. Berry did not object for plain error. *Anderson v. State*, 2022 WY 119, ¶ 35, 517 P.3d 583, 593 (Wyo. 2022) (citing *Mendoza v. State*, 2021 WY 127, ¶ 12, 498 P.3d 82, 85 (Wyo. 2021)). "To satisfy the plain error standard, [Mr. Berry] must show (1) the record is clear about the incident alleged as error; (2) a violation of a clear and unequivocal rule of law; and (3) he was denied a substantial right resulting in material prejudice." *Id.* (quoting *Ingersoll v. State*, 2022 WY 74, ¶ 9, 511 P.3d 480, 484 (Wyo. 2022)). Mr. Berry must demonstrate "it is reasonably probable he would have received a more favorable verdict if the error had not been made." *Leners v. State*, 2021 WY 67, ¶ 24, 486 P.3d 1013, 1018 (Wyo. 2021) (quoting *Weston v. State*, 2019 WY 113, ¶¶ 34–41, 451 P.3d 758, 768–69 (Wyo. 2019)). "Failure to establish each element precludes a finding of plain error." *Anderson*, ¶ 35, 517 P.3d at 593 (quoting *Leners*, ¶ 23, 486 P.3d at 1018).

### A. Calling Mrs. Berry for the Sole Purpose of Invoking Spousal Privilege

[¶38] Mr. Berry asserts "the State's decision to call [Mrs.] Berry in front of the jury to bolster her case after arguing a contrary position prior to opening statements was an improper attempt to persuade the jury to convict Mr. Berry based on an improper inference rather than the evidence." The State contends a prosecutor does not commit misconduct by doing something that was expressly approved by the trial court.

[¶39] The conduct at issue in this claim is different than that in Mr. Berry's other prosecutorial misconduct claims because the prosecutor had express permission from the district court to call Mrs. Berry to the stand. We have held a prosecutor does not commit an improper or illegal act that constitutes misconduct when she engages in conduct that was expressly approved by the court. *Craft v. State*, 2013 WY 41, ¶ 13, 298 P.3d 825, 829 (Wyo. 2013); *but see McGinn v. State*, 2015 WY 140, ¶¶ 14–26, 361 P.3d 295, 299–301 (Wyo. 2015) (finding misconduct when the prosecutor continued to ask "was she lying" questions after the court overruled defendant's objection). In this case, the prosecutor and the district court were clearly aware that improperly handling the invocation of spousal privilege could result in reversible error, which they wanted to avoid. After argument, an opportunity for briefing, and Mr. Berry's express endorsement, the district court gave the prosecutor permission to call Mrs. Berry to the stand for the purpose of invoking spousal privilege. Accordingly, the prosecutor did not violate a clear and unequivocal rule of law. Mr. Berry's real issue is whether the district court properly allowed Mrs. Berry to invoke spousal privilege in front of the jury, an issue we found he waived by inviting the alleged error.

### B. Vouching For Witnesses

#### 1. *Vouching for the Uinta County Sheriff's Office*

[¶40] Mr. Berry asserts the prosecutor committed misconduct when she vouched for the

credibility of the Uinta County Sheriff's Office. Specifically, he objects to the prosecutor's statement that the Uinta County Sheriff's Office "worked as a team." Mr. Berry did not object to this statement at trial, so we review it for plain error.

[¶41] The first prong of plain error is satisfied because the record clearly reflects the alleged error. Turning to the second prong, Mr. Berry "must establish a violation of a clear and unequivocal rule of law in a clear and obvious, not merely arguable, way." *Bogard*, 2019 WY 96, ¶ 21, 449 P.3d at 321 (quoting *Solis v. State*, 2013 WY 152, ¶ 39, 315 P.3d 622, 631 (Wyo. 2013)).

> "Wyoming law is clear that a prosecutor may not elicit opinions concerning witness credibility or personally vouch for the credibility of a witness." *Collins v. State*, 2015 WY 92, ¶ 34, 354 P.3d 55, 64 (Wyo. 2015) (quoting *Fennell v. State*, 2015 WY 67, ¶ 31, 350 P.3d 710, 722 (Wyo. 2015)). Vouching occurs when a prosecutor offers his opinion of a witness's credibility, as distinguished from when he infers credibility from the same evidence the jury has before it. *Collins*, ¶ 36, 354 P.3d at 64–65 (quoting *Fennell*, ¶ 43, 350 P.3d at 725).

*Byerly v. State*, 2019 WY 130, ¶ 21, 455 P.3d 232, 242 (Wyo. 2019). We have stated:

> When the prosecutor asserts his credibility or personal belief, an additional factor is injected into the case. This additional factor is that counsel may be perceived by the jury as an authority whose opinion carries greater weight than their own opinion; that members of the jury might be persuaded not by the evidence, but rather by a perception that counsel's opinions are correct because of his position as prosecutor, an important state official entrusted with enforcing the criminal laws of a sovereign state. While the prosecutor is expected to be an advocate, he may not exploit his position to induce a jury to disregard the evidence or misapply the law.

*Dixon*, 2019 WY 37, ¶ 49, 438 P.3d at 234 (quoting *Teniente v. State*, 2007 WY 165, ¶ 30, 169 P.3d 512, 524 (Wyo. 2007)).

[¶42] By stating the Uinta County Sheriff's Office "worked as a team," the prosecutor was not asserting her personal belief or trying to induce the jury to disregard the evidence or misapply the law. When viewed in context, it is clear her statements were summarizing the evidence presented at trial and responding to the defense's argument the investigation could have been more thorough:

There was a lot of discussion about the investigation in this case. And so, let's face it head-on. In relation to this matter, the Wyoming - - the Uinta County Sheriff's Office certainly worked as a team. You heard through the course of this matter that the initial person called to help Dr. Bechaver on July 1st was Calvin Robinson. And then you heard that we also had Deputy Barker that was involved. His primary initiation of his involvement, as he told you, was in relation in trying to figure out where these shots were coming from and how to identify where they were. You heard the involvement of Cameron Winberg, the involvement of Sergeant Buhmann, the involvement of Deputy Grasinger, the involvement of Deputy Hale. And so, in relation to issues, is it likely that maybe somebody needs to be more detailed in their reporting? Yeah.

In this case, the prosecutor was not offering her opinion based on her personal experience with the Uinta County Sheriff's Office, thus creating a risk the jurors would view her as an authority whose knowledge carried greater weight than their own. *Fennell,* 2015 WY 67, ¶ 43, 350 P.3d at 725. The prosecutor did not violate a clear and unequivocal rule of law when she said the Uinta County Sheriff's Office worked as a team.

### 2. *Vouching for the DNA Expert*

[¶43] Mr. Berry asserts the prosecutor engaged in misconduct when she vouched for the Crime Lab's DNA expert, Christina Buettner, by saying: "You heard from a DNA expert. Ms. Buettner is about as high of an expert as you can go." The State asserts this was not vouching but was instead "a reasonable inference based on her testimony regarding her supervisory position, qualifications, and expertise."

[¶44] Mr. Berry did not object to this comment at trial, so we review for plain error. The first prong of the plain error test is met because the alleged error is clearly reflected in the record. Turning to the second prong, vouching for a witness violates a clear and unequivocal rule of law. *Byerly*, 2019 WY 130, ¶ 21, 455 P.3d at 242. At first blush, this comment might appear to be vouching. However, "we judge the challenged comments not in isolation but in the context of the prosecutor's entire argument, considering the context of the comments and comparing them with the evidence produced at trial." *Lafond v. State*, 2004 WY 51, ¶ 15, 89 P.3d 324, 329 (Wyo. 2004) (citing *Wilks v. State*, 2002 WY 100, ¶ 26, 49 P.3d 975, 986 (Wyo. 2002)).

[¶45] Throughout the trial, Mr. Berry argued the Uinta County Sheriff's Office should have asked the Crime Lab to test the Ruger 10/22 rifle for DNA. Although the results might not have been able to show if it was Mr. Berry, Mrs. Berry, or SB, who fired the weapon, Mr. Berry argued it might have shown it was Mr. Holmes who shot the horses. In

response to this argument, the State repeatedly asserted it was the Crime Lab's policy not to test for DNA on objects taken in cases where there are commonly domiciled people because it is of little probative value. Ms. Buettner testified it would not be unusual for DNA from all household members to be found on an object in the house, even if they had never touched it, due to secondary or even tertiary transfer.[2] She also testified it would not be uncommon to find DNA from someone who was a frequent visitor at the home, although not at the same level as household members. Ms. Buettner also testified the presence of DNA on an object cannot identify when the DNA was placed on the object, how it was placed there, or if it got there through direct contact or secondary transfer.

[¶46] The challenged comment appeared in the State's rebuttal argument:

> Again, regardless of how we might want information to prevail an attorneys' attempt to educate or describe things like DNA or otherwise is not evidence. You heard from a DNA expert. Ms. Buettner is about as high of an expert as you can go. And you heard her testify it's not just about the expense. This is something with your life experiences and your interactions. Do you spend thousands of dollars on a piece of equipment or on a paper or on some other tool that you'll get very minimal value from? You don't. That would be a poor business practice.
>
> And what she said is that when you have commonly domiciled individuals, that the probative value is so diminished that except in exceptional circumstances - - she didn't say exceptional. She said she has to hear the case. But generally, they won't test it. And there is clear assertion that if there was access to this firearm, it is from people, by [defense counsel's] own statement, that lived in that residence. And so, as she noted, and as officers have noted, regardless of whether there was DNA, first of all, what probative value would it have had compared to the expense that was related?

---

[2] Ms. Buettner testified about how secondary and tertiary transfer occurs:

> Secondary transfer is, for example, if I touched this table and now left my skin cells here. Another individual could come along, touch the same place that I touched, and they would pick up some of my DNA onto their hands. And so, that is transfer not directly from me to that individual, but from the table that I touched to them. So, that's a secondary transfer. There's also, further down the line, a tertiary transfer where now that individual has my DNA on them and they can now transfer that DNA to another surface.

> Could it have been done? Yes. In a world of CSI, we would love to have DNA evidence on every possible case we possibly can, because it's fascinating. DNA is amazing. It is so interesting, and kind of scary sometimes, to think of the information that they can provide about us and how it can be interacted with. But you heard her talk about the case study with the ATF agent where they ensured that the ammunition that was being used had not been touched by anybody besides the ATF agent. They used it as a test sample. And whose DNA was found on the bullet casing? Was it the ATF agent's? No. You heard Ms. Buettner state that it was his daughter who could never have been anywhere near the ammunition. She never touched it. She never interacted with it. Secondary transfer is real. And DNA, except when we can identify specifically when a transfer could have occurred, cannot show how or when it was transferred. And so, in relation to issues, while attorneys can bark and cry all we want, it doesn't prove what is being asserted.

When viewed in context, the prosecutor was not trying to "exploit [her] position to induce a jury to disregard the evidence or misapply the law." *Budig v. State*, 2010 WY 1, ¶ 17, 222 P.3d 148, 156 (quoting *Teniente*, 2007 WY 165, ¶ 30, 169 P.3d at 524. She was asking the jurors to consider the evidence and determine the lack of DNA evidence did not create reasonable doubt. The jury heard for themselves exactly what Ms. Buettner's qualifications were. The prosecutor "did not create the perception that [she] had special knowledge of or experience with [Ms. Buettner] beyond what the jury had from hearing the testimony." *Collins*, 2015 WY 92, ¶ 38, 354 P.3d at 65. Mr. Berry failed to show the prosecutor violated a clear and unequivocal rule of law by personally vouching for Ms. Buettner's credibility. We also note Mr. Berry relied on Ms. Buettner's expertise to support his defense. Therefore, he cannot show he was prejudiced by this comment.

### C. Comments Made to Inflame the Passions of the Jury

[¶47] In her closing argument, the prosecutor made statements Mr. Berry now asserts constituted prosecutorial misconduct. First, Mr. Berry complains about the following comment:

> While horse racing raged on at the Downs and [the Dunfords] should have been in the height of enjoying their time having their horses coming out of those gates, making that money, enjoying those beautiful babies that were in their pasture, that time and that enjoyment was cut incredibly short with these

15

tragic losses and injuries and then the worry related to those
foals.

Mr. Berry also takes issue with this statement: "The other possibility is someone would intentionally kill these two mothers with foals at their sides." Mr. Berry also finds fault with the following statement: "Little Fibber is still here and able to raise her babies." Finally, Mr. Berry challenges a statement about the deaths of Red River Romance and Less Stress:

> [Red River Romance] ran into that fence, and went over the top, and died when her heart finally gave out from the loss of blood. It would be a horrible way to die. What's even more horrible is to have any animal have that much stomach pain [as Less Stress had] from June 25th to July 5th. Your stomach is not moving. You're not digesting food. You're just getting sicker and sicker.

[¶48] Mr. Berry asserts "the prosecutor's multiple references to 'mothers' and 'babies' and 'beautiful babies' was improper." He alleges using those terms instead of mares and foals was designed to play to the passions of the jury by "humanizing the horses." The State asserts we do not need to address whether these remarks constituted misconduct because Mr. Berry was not prejudiced by them.

[¶49] "In evaluating closing argument, we recognize that counsel is allowed wide latitude; the prosecutor may comment on all of the evidence and may suggest reasonable inferences from the evidence." *Bogard*, 2019 WY 96, ¶ 19, 449 P.3d at 321 (citing *Teniente*, 2007 WY 165, ¶ 30, 169 P.3d at 524). "We measure the propriety of closing arguments in the context of the entire argument and compare them with the evidence produced at trial." *Id.* (quoting *Doherty v. State*, 2006 WY 39, ¶ 18, 131 P.3d 963, 969 (Wyo. 2006)).

[¶50] Mr. Berry did not object to any of these comments below, so we review for plain error. *Anderson*, 2022 WY 119, ¶ 35, 517 P.3d at 593 (citing *Mendoza*, 2021 WY 127, ¶ 12, 498 P.3d at 85). The first prong of plain error is satisfied because the alleged errors are clearly reflected in the record. Turning to the second prong, "[i]t is well-settled that 'arguments calculated to inflame the passion or prejudice of the jury violate ABA Standards for Criminal Justice regarding argument to the jury.'" *Armajo*, 2020 WY 153, ¶ 38, 478 P.3d at 194 (quoting *Bogard*, 2019 WY 96, ¶ 67, 449 P.3d at 331). "Remarks and evidence that tend to inflame the passions or prejudices of a jury cross the line separating fact from emotion, and such material causes us to carefully scrutinize the record for prosecutorial error." *Solis*, 2013 WY 152, ¶ 50, 315 P.3d at 633.

[¶51] Mr. Dunford referred to the foals as "babies" a few times during his testimony. Other than those brief references, the State and other witnesses referred to the horses'

16

offspring as "foals," "colt," or "filly." While the other references were not inflammatory, the context in which the prosecutor used the terms mothers and babies shows she was attempting to inflame the jury's passions or play to their emotions.

[¶52] Turning to the other comments, the State was well aware it did not need to prove the horses suffered in order to obtain a conviction. Toward the beginning of her closing argument, the prosecutor informed the jury "[t]here [is] no requirement of the horses to suffer or any actual cruelty in the disposition of the animal." Later in her closing, the prosecutor again informed the jury they did not need to find "these horses suffered before they died." Yet, the prosecutor chose to discuss the details of the horses' deaths, opining they died in horrible ways. Both the use of the terms mothers and babies and the descriptions of the horses' deaths were completely unnecessary and were made to inflame the jury's passions. Taking these comments together, Mr. Berry established the prosecutor crossed the line separating fact from emotion and violated a clear and unequivocal rule of law in a clear and obvious way.

[¶53] Having found the comments were improper and amounted to prosecutorial misconduct, we must decide if Mr. Berry was prejudiced by those comments. "The single most significant factor in determining whether [Mr. Berry] was prejudiced by the prosecutorial misconduct is the strength of the State's case against him." *Bogard*, 2019 WY 96, ¶ 72, 449 P.3d at 332 (citing *Hathaway*, 2017 WY 92, ¶ 33, 399 P.3d at 634–35). Mr. Berry argues this was not a "particularly strong" case. Mr. Berry conceded most of the elements of the crime, and he admitted Less Stress was shot with a gun found in his home. Mr. Berry's defense was the rifle belonged to his wife, and his wife, young daughter, or Mr. Holmes had access to the weapon and could have shot the horses. When the deputies arrived to execute the search warrant, Mr. Berry admitted he had fired a .22 caliber gun on his property. The Crime Lab was able to match the two bullets taken from Less Stress and all three of the spent shell casings to the weapon taken from Mr. Berry's home. While the evidence in this case was not overwhelming, it was also not insubstantial.

[¶54] When determining if Mr. Berry was prejudiced by the prosecutor's remarks, we also consider "(1) whether the errors related to a material, consequential fact; (2) the effect of the court's instructions to the jury; and (3) the severity and pervasiveness of the misconduct." *Bogard*, 2019 WY 96, ¶ 72, 449 P.3d at 332. The comments did not relate to a material or consequential fact. The prosecutor repeatedly informed the jury it did not have to prove the horses suffered. Similarly, it was not necessary to prove the horses were mothers with babies. Mr. Berry did not request any curative jury instructions, and the district court did not give any. However, the jury was properly instructed about the elements of the charged crimes. The jury was also instructed it was the exclusive judge of the facts, those facts had to be determined from the evidence, and statements by counsel could not be regarded as evidence. This instruction lessened any prejudice Mr. Berry might have suffered. *See Rodriguez v. State*, 2022 WY 109, ¶ 35, 516 P.3d 850, 857 (Wyo. 2022); *Whitney v. State*, 2004 WY 118, ¶ 92, 99 P.3d 457, 488 (Wyo. 2004)). The misconduct

17

was not severe or pervasive and was limited to a few comments in closing argument.

[¶55]  After considering all these factors, we find Mr. Berry has not shown a reasonable probability the outcome of his trial would have been more favorable to him if these comments had not been made.  Mr. Berry was only convicted of animal cruelty for shooting Less Stress.  The jury acquitted Mr. Berry of the other two counts.  This shows the jury was not swayed by the prosecutor's attempts to inflame its passions, and the jury based its decision on the evidence, not emotion.

### D.  Improper Burden Shifting

[¶56]  Deputy Barker testified Red River Romance and Little Fibber were most likely shot during the evening of June 30, 2020, or early the morning of July 1, 2020.  Deputy Barker admitted on cross-examination he did not look into Mr. Berry's or Mrs. Berry's work schedules for those days.  During his testimony, Mr. Holmes indicated he usually visited the Berry home in the afternoons when Mr. Berry was not working.  Mr. Berry did not testify.  Mr. Berry called a single witness, who testified Mrs. Berry purchased the Ruger 10/22 rifle.

[¶57]  In his closing argument, Mr. Berry asserted the State failed to prove he was the one who pulled the trigger in part because the State did not get a warrant for his or his wife's work schedules.  In her rebuttal argument, the prosecutor stated: "However, because he chose to present a defense, instead of just criticizing Deputy Barker's investigation, if Mr. Berry was at work instead of at home in the afternoon and the evenings, as Mr. Holmes would assert, where is his work schedule?"  Mr. Berry objected to this remark, and the district court sustained the objection.

[¶58]  Mr. Berry asserts "the prosecutor engaged in burden shifting by improperly arguing that the defense did not produce evidence of Mr. Berry's work records."  The State asserts the prosecutor's comment in this case did not amount to burden shifting.  Instead, it claims Mr. Berry "'opened the door' by commenting on the State's failure to call witnesses," and the State was allowed "to 'close that same door' by pointing out 'that the witnesses were equally available to the defendant and that he could have called them if they were unfavorable to the State.'"

[¶59]  Because Mr. Berry objected to this comment, we review for harmless error. *Armajo*, 2020 WY 153, ¶ 33, 478 P. 3d at 193 (citing *Bogard*, ¶ 18, 449 P.3d at 321).  "In a criminal case, the State bears the burden to prove the defendant is guilty; a defendant has no burden to prove his innocence." *Black v. State*, 2020 WY 34, ¶ 22, 458 P.2d 1245, 1250 (Wyo. 2020) (citing *Lane v. State*, 12 P.3d 1057, 1066 (Wyo. 2000)).  "[T]he prosecutor may not, during argument, attempt to shift that burden to the defendant." *Hamilton v. State*, 2017 WY 72, ¶ 16, 396 P.3d 1009, 1015 (Wyo. 2017) (quoting *Harris v. State*, 2008 WY 23, ¶ 17, 177 P.3d 1166, 1171 (Wyo. 2008)).  "[A] prosecutor may not argue that the defendant

18

should have put on evidence to explain a missing fact or theory because such an argument improperly shifts the burden of proof to the defendant." *Id.* at ¶ 17, 396 P.3d at 1015.

[¶60]   In *Hamilton*, the defendant asserted the prosecutor committed misconduct when he made multiple comments claiming the defendant could not explain the presence of his DNA on the victim "in any reasonable manner." *Id.* at ¶ 15, 396 P.3d at 1014.   The prosecutor's statements went beyond mere comments on the evidence presented, and suggested the defendant needed "to explain the evidence when he had no burden at all." *Id.* at ¶ 18, 396 P.3d at 1015.   We found "[t]he prosecutor's statements regarding the burden of proof transgressed a clear and unequivocal rule of law . . . ." *Id.*; *see also Schafer v. State*, 2008 WY 149, ¶ 25, 197 P.3d 1247, 1252 (Wyo. 2008) (finding the prosecutor attempted to engage in burden shifting by saying "if there was some explanation for it, they could have put it on.").

[¶61]   While the State cannot imply a defendant has the burden to explain the evidence, we have also recognized:

> [T]he State is within its proper bounds when a prosecutor comments in argument upon the state of the evidence, including a defendant's failure to introduce material evidence or to call logical witnesses. *Fortner v. State,* 843 P.2d 1139, 1147 (Wyo. 1992).   Similarly, a prosecutor may point out that certain evidence is uncontroverted, or that there is no evidence on a certain point. *Belden v. State,* 2003 WY 89, ¶ 47, 73 P.3d 1041, 1089 (Wyo. 2003).   While it is not proper for a prosecutor to comment upon a defendant's exercise of his right to silence, it is not improper for a prosecutor to point out the lack of evidence to support a defendant's theory of the case. *Id.*

*Proffit v. State*, 2008 WY 114, ¶ 31, 193 P.3d 228, 240–41 (Wyo. 2008).   In *Proffit*, the defendant testified there were employment records and medical records that could support his version of events. *Id.* at ¶ 29, 193 P.3d at 240.   In his closing statement, the prosecutor argued the defendant should have produced those work records.   On appeal, the defendant argued the State had impermissibly attempted to shift the burden of proof.   We disagreed and found:

> We cannot say in this case that the prosecutor's argument was so far outside the realm of appropriate argument as to be misconduct. The appellant testified, and the prosecutor's statements were merely comments upon that testimony. It does not violate an appellant's right to silence, or shift the burden of proof to him, merely to point out the holes or deficiencies in his testimony. Consequently, we cannot say the prosecutor

clearly violated an unequivocal rule of law, and we, therefore, cannot say that plain error has been shown.

*Id.* at ¶ 32, 193 P.3d at 241.

[¶62] In *Fortner*, the defendant argued in closing argument the State should have subpoenaed certain witnesses. 835 P.2d at 1157. In rebuttal, the State argued the defendant could have subpoenaed those witnesses. *Id.* On appeal, the defendant argued the prosecutor's comment was an improper attempt to shift the burden of proof. *Id.* We said:

> In any case, the prosecutor made the statements about appellant's failure to call witnesses in response to appellant's argument that the *State* had not called those same witnesses. The inference was that the witnesses would have been unfavorable to the State. Once appellant "opened the door" by commenting on the State's failure to call the witnesses, he allowed the prosecution to close that same door. *See Sanville v. State*, 593 P.2d 1340 (Wyo. 1979) (discussing the "opening of the door" rule). The State merely pointed out that the witnesses were equally available to appellant and that he could have called them if they were unfavorable to the State. We hold that the trial court did not impermissibly shift the burden of proof or deride the presumption of innocence by allowing the State to make the challenged comments.

*Id.* at 1158.

[¶63] In this case, the prosecutor made the statement about Mr. Berry's failure to produce the work schedules in response to Mr. Berry's argument that the State had not subpoenaed those same documents. The inference was that the documents would have been unfavorable for the State. Once Mr. Berry "opened the door," the State was allowed to close that door by pointing out the documents were equally available to Mr. Berry, and he could have produced them if they were unfavorable to the State. The comment did not amount to improper burden shifting. We also note the district court sustained Mr. Berry's objection to this question. Thus, the State was precluded from pursuing the allegedly improper argument.

> IV. *Did being ordered to participate in the preparation of a presentence investigation under Wyoming Statute § 7-13-303 and Rule 32 of the Wyoming Rules of Criminal Procedure violate Mr. Berry's right against self-incrimination under the Federal and Wyoming Constitutions?*

[¶64] At Mr. Berry's arraignment, the district court ordered him to cooperate in the

20

preparation of a presentence investigation (PSI) as a condition of his bond. The district court subsequently entered a written order requiring Mr. Berry to "contact probation and parole and make immediate arrangements (within 24 hours hereof) with the appropriate personnel" so the PSI and substance abuse evaluation could be completed. This order indicated it was entered pursuant to the "stipulation of the parties." The PSI remained sealed until after Mr. Berry was convicted. Mr. Berry did not object to participating in the preparation of the PSI, nor did he argue the order violated his right against self-incrimination.

[¶65] On appeal Mr. Berry asserts for the first time Wyoming Statute § 7-13-303 and W.R.Cr.P. 32, as applied to him, violated his right against self-incrimination by "requiring Mr. Berry undergo a presentence investigation prior to an adjudication of guilt, as a condition to pretrial release on bond—in violation of the substantive due process rights guaranteed by" the Fifth, Eighth, and Fourteenth amendments to the Federal Constitution and Article 1, Sections 6, 7, 11, and 36 of the Wyoming Constitution. The State argues we should not address this argument because it was not raised below. Alternatively, the State argues Mr. Berry cannot show the statute or rule is unconstitutional.

[¶66] "[W]e have repeatedly held we will not consider an issue raised for the first time on appeal." *Borja v. State*, 2023 WY 12, ¶ 24, 523 P.3d 1212, 1218 (Wyo. 2023) (citing *Rogers v. State*, 2021 WY 123, ¶ 14, 498 P.3d 66, 70 (Wyo. 2021)). "We recognize only two exceptions to that rule: when the issue raises jurisdictional questions or it is of such a fundamental nature that it must be considered." *Id.* (citing *Rogers*, ¶ 14, 498 P.3d at 70). "[A]n allegation that a statute is unconstitutional is not a jurisdictional defense and may be waived." *Guy v. State*, 2008 WY 56, ¶ 43, 184 P.3d 687, 700 (Wyo. 2008) (citing *Jones v. State*, 2006 WY 40, ¶ 8, 132 P.3d 162, 164–65 (Wyo. 2006)). Even a constitutional issue is not necessarily fundamental. *Borja*, ¶ 24, 523 P.3d at 1218 (citing *Belanger v. State*, 2021 WY 110, ¶ 22 n.1, 496 P.3d 770, 776 n.1 (Wyo. 2021)). Mr. Berry asserts this issue is fundamental, because "[n]o constitutional right of an accused person is more sacred than his right not to make a statement or testify against himself."

[¶67] "When a claim is raised for the first time on appeal, our review is for plain error, regardless of whether the error asserted is of a fundamental nature." *Herrera v. State*, 2019 WY 93, ¶ 21, 448 P.3d 844, 850 (Wyo. 2019) (citing *Lemus v. Martinez*, 2019 WY 52, ¶ 42 n.9, 441 P.3d 831, 840 n.9 (Wyo. 2019)). As discussed above, to establish plain error, Mr. Berry "must show (1) the record is clear about the incident alleged as error; (2) a violation of a clear and unequivocal rule of law; and (3) he was denied a substantial right resulting in material prejudice." *Anderson,* 2022 WY 119, ¶ 35, 517 P.3d at 593 (quoting *Ingersoll*, 2022 WY 74, ¶ 9, 511 P.3d at 484).

[¶68] In this case, Mr. Berry cannot satisfy the first prong of the test, because the record does not clearly reflect the alleged error. Mr. Berry was arraigned with two other defendants in unrelated cases. The portion of the arraignment where he was allegedly

21

ordered to make incriminating statements was not transcribed. The only discussion of the PSI that was transcribed was the following:

> THE COURT: Mr. Berry, you've heard me enter the order for the Presentence Investigation and Substance Abuse Assessment in Mr. Rico's case as well as Mr. Jensen's case. Do you understand what I'm going to require you to do when I enter that order in your case?
>
> DEFENDANT BERRY: Yes.
>
> THE COURT: Mr. Berry, do you understand that if you don't comply with that order, you will face some additional penalties for contempt of court?
>
> DEFENDANT BERRY: Yes.
>
> THE COURT: And do you also understand, Mr. Berry, that I'm going to modify the terms and conditions of the bond that you appear to have already made to require compliance with this order? So, if you don't comply with this order, your bond could be revoked and you could have to sit in jail until this matter is completed. Do you understand that?
>
> DEFENDANT BERRY: Yes.
>
> THE COURT: The Court is entering the order for the Presentence Investigation and Substance Abuse Assessment in your case. And I'm modifying the terms and conditions of your bond to require compliance with this order as an additional term and condition of that bond.
>
> [Defense Counsel], would you and Mr. Berry like that sealed or would you like it disclosed?
>
> [DEFENSE COUNSEL]: Your Honor, let's go ahead and have that remained sealed.
>
> THE COURT: All right. It will remain sealed.

There is nothing in this exchange that shows Mr. Berry was ordered to make incriminating statements or testify against himself. In addition, as discussed above, the written order entered after the arraignment only ordered Mr. Berry to contact Probation and Parole to

22

start the PSI and substance abuse evaluation. It did not order Mr. Berry to make incriminating statements. Further, we reviewed the PSI, and it does not contain any incriminating statements made by Mr. Berry. Indeed, the PSI states: "Due to Defendant's not guilty plea, no Defendant's version was given." Because Mr. Berry did not establish the first prong of the plain error test, we will not analyze this claim any further.

## CONCLUSION

[¶69] Mr. Berry waived his argument that the district court committed reversible error when it allowed his wife to invoke spousal privilege in the presence of the jury. Mr. Berry was not prejudiced by the testimony of a witness and the admission of an exhibit that was not disclosed pretrial. Although the prosecutor committed misconduct by making comments designed to inflame the passions of the jury, Mr. Berry was not prejudiced by that misconduct. Mr. Berry failed to prove the district court committed plain error when it ordered him to participate in the preparation of a PSI as a condition of his bond. Affirmed.